49 F.3d 586
 63 USLW 2569
 COMPASSION IN DYING, a Washington nonprofit corporation;
Jane Roe; John Doe; James Poe; Harold
Glucksberg, M.D., Plaintiffs-Appellees,
v.
STATE OF WASHINGTON; Christine Gregoire, Attorney General
of Washington, Defendants-Appellants.
 No. 94-35534.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted December 7, 1994.
Decided March 9, 1995.
 
 Eugene A. Wright, Circuit Judge, filed dissenting opinion.
 William L. Williams, Sr. Asst. Atty. Gen., Olympia, WA, for defendants-appellants.
 Kathryn L. Tucker, David J. Burman, Thomas L. Boeder, Kari Anne Smith, Perkins Coie, Seattle, WA, for plaintiffs-appellees.
 Wesley J. Smith, San Francisco, CA, for amicus curiae Intern. Anti-Euthanasia Task Force.
 Katrin E. Frank, Robert A. Free, Kathleen Wareham, MacDonald, Hoague & Bayless, Seattle, WA, for amicus curiae Ten Surviving Family Members.
 James Bopp, Jr., Thomas J. Marzen, Daniel Avila, John Altomare, Jane E.T. Brockmann, Nat. Legal Center for the Medically Dependent and Disabled, Inc., Indianapolis, IN, as amicus curiae.
 John R. Reese, Robert A. Lewis, Page R. Barnes, Amy J. Metzler, Holly Morris, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, for amicus curiae Americans for Death with Dignity.
 Mary D. Clement, Junction City, OR, for amicus curiae Euthanasia Research & Guidance Organization.
 Mark E. Chopko, Michael F. Moses, Washington, DC, for amicus curiae U.S. Catholic Conference.
 Paul Benjamin Linton, Clarke D. Forsythe, Americans United for Life, Chicago, IL, for amici curiae, Washington State Legislators.
 Barbara Allan Shickich, Joseph E. Shickich, Jr., Riddell, Williams, Bullitt & Walkinshaw, Seattle, WA, for amicus curiae Washington State Hosp. Ass'n and Catholic Health Ass'n of the U.S.
 Catherine W. Smith, Edwards, Sieh, Wiggins & Hathaway, Seattle, WA, for amicus curiae Amici State Legislators.
 Todd Maybrown, Allen, Hansen & Maybrown, Seattle, WA, for amici curiae the American Civ. Liberties Union of Washington, the Northwest Women's Law Center, Lambda Legal Defense and Educ. Fund, Inc., AIDS Action Council, the Northwest AIDS Foundation, the Seattle AIDS Support Group, the Gray Panthers Project Fund, the Older Women's League, the Seattle Chapter of the Nat. Organization for Women, the American Humanist Ass'n, the Nat. Lawyers Guild, Local 6 of Service Employees Intern. Union, Temple De Hirsch Sinai, the Unitarian Universalist Ass'n, the Seattle Chapter and the Pacific Northwest Dist. Council of the Japanese American Citizens League.
 Kirk B. Johnson, Michael L. Ile, David Orentlicher, Jack R. Bierig, Sidley & Austin, Chicago, IL, Paul E. Kalb, Sidley & Austin, Washington, DC, for amicus curiae American Medical Ass'n.
 Appeal from the United States District Court for the Western District of Washington.
 Before: WRIGHT, NOONAN, and O'SCANNLAIN, Circuit Judges.
 Opinion by Judge NOONAN; Dissent by Judge WRIGHT.
 NOONAN, Circuit Judge:
 
 
 1
 The State of Washington (Washington) appeals the decision of the district court holding unconstitutional Washington's statute on promoting a suicide attempt. Finding no basis for concluding that the statute violates the Constitution, we reverse the district court.
 
 The Statute
 The challenged statute reads as follows:
 Promoting a suicide attempt
 
 2
 (1) A person is guilty of promoting a suicide attempt when he knowingly causes or aids another person to attempt suicide.
 
 
 3
 (2) Promoting a suicide is a Class C felony. Wash.Rev.Code 9A.36.060.
 
 The Plaintiffs
 
 4
 Compassion in Dying is a nonprofit incorporated in the state of Washington. Its avowed purpose is to assist persons described by it as "competent" and "terminally ill" to hasten their deaths by providing them information, counselling, and emotional support but not by administering fatal medication.
 
 
 5
 Three individuals were plaintiffs in their own right. Their identities are cloaked by an order permitting them to litigate under pseudonyms. They are now deceased. Jane Roe was a 69-year-old physician, suffering from cancer; she had been bedridden for seven months at the time the suit was brought and died before judgment was entered by the district court. John Doe was a 44-year-old artist, who was partially blind at the time of suit and was also suffering from AIDS; he had been advised that his disease was incurable; he died prior to judgment. James Poe was a 69-year-old patient suffering from chronic obstructive pulmonary disease; he was connected to an oxygen tank at all times. He died after judgment but prior to the hearing of this appeal.
 
 
 6
 Four physicians also joined the suit asserting their own rights and those of their patients. Harold Glucksberg has specialized in the care of cancer since 1985 and is a clinical assistant professor at the University of Washington School of Medicine. According to his sworn declaration, he "occasionally" encounters patients whom he believes he should assist in terminating their lives, but does not because of the statute; he refers to two such patients, both deceased. Abigail Halpern is the medical director of Uptown Family Practice in Seattle and serves as a clinical faculty member at the University of Washington School of Medicine. In her practice, according to her sworn declaration, she "occasionally" treats patients dying of cancer or AIDS, whose death she believes she should hasten but does not because of the statute; she refers to one such patient, now deceased. Thomas A. Preston is chief of cardiology at Pacific Medical Center in Seattle and professor of Medicine at the University of Washington School of Medicine. According to his sworn declaration, he "occasionally" treats patients whose death he believes he should hasten but does not on account of the statute; he refers to one such patient, now deceased. Peter Shalit is in private practice in Seattle and the medical director of the Seattle Gay Clinic; he is a clinical instructor at the University of Washington School of Medicine. According to his sworn declaration, he "occasionally" treats patients whose death he believes he should hasten, but does not on account of the statute; he refers to one such patient, now deceased.
 
 PROCEEDINGS
 
 7
 On January 29, 1994, the plaintiffs brought suit against Washington, seeking a declaration that the statute violated 42 U.S.C. Sec. 1983 and the Constitution of the United States; additionally, they asked that enforcement of the statute be enjoined.
 
 
 8
 The plaintiffs introduced the declarations of the physicians already noted, together with declarations from the executive director of Compassion in Dying and from Jane Roe, John Doe, and James Poe. They also introduced the sworn declaration of John P. Geyman, who had served from 1976 through 1990 as professor and chairman of the Department of Family Medicine at the School of Medicine of the University of Washington and is now engaged in rural practice at Friday Harbor. According to him, there is "often a severe adverse emotional and psychological effect" on patients unable because of the statute to broach the subject of their desire to hasten their deaths or who do broach the subject and are rebuffed.
 
 
 9
 The plaintiffs moved for summary judgment, and the defendants made a cross-motion for summary judgment. On May 3, 1994, the district court ruled on these motions. It denied the motion of the four physician plaintiffs asserting their own claims "on the grounds that the basis for those claims has not been adequately addressed." It denied Compassion in Dying's claim on its own behalf "for the same reason." It denied the cross-motion of Washington. It granted the motion for summary judgment of Jane Roe, John Doe and James Poe and the similar motion of the physician plaintiffs "on behalf of their terminally ill patients." The court declined to enjoin enforcement of the statute but declared the statute to violate the Constitution of the United States.
 
 
 10
 The district court reached its conclusion as to unconstitutionality on two grounds. First, the court held that the statute violated the liberty guaranteed by the Fourteenth Amendment against deprivation by a state. The court reached this conclusion by noting "a long line of cases" protecting "personal decisions relating to marriage, procreation, contraception, family relationships, child rearing and education." The court quoted as the explanation of this line the statement made in Planned Parenthood v. Casey, --- U.S. ----, ----, 112 S.Ct. 2791, 2807, 120 L.Ed.2d 674 (1992): "These matters, including the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State."
 
 
 11
 The district court analogized the "terminally ill person's choice to commit suicide" to the choice of abortion protected by Casey, stating: "this court finds the reasoning in Casey highly instructive and almost prescriptive." Like the abortion decision, the court found the decision by a terminally ill person to end his or her life to be one of the most intimate and personal that could be made in a lifetime and a choice central to personal autonomy and dignity.
 
 
 12
 The district court also found Cruzan v. Director, Missouri Dept. of Health, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) to be "instructive." It quoted that case's reference to "the recognition of a general liberty interest in refusing medical treatment," Cruzan at 278, 110 S.Ct. at 2851, and the assumption for purposes of the decision in Cruzan "that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition." Id. at 279, 110 S.Ct. at 2852. The district court stated that it did not believe that a distinction of constitutional significance could be drawn "between refusing life-sustaining medical treatment and physician-assisted suicide by an uncoerced, mentally competent, terminally ill adult." Combining its exegesis of Casey and Cruzan, the district court reached its conclusion that there was a constitutional right to physician-assisted suicide.
 
 
 13
 The district court then reviewed the statute to determine whether, on its face, it imposed an "undue burden" on a personal right of the Casey kind. See Casey, --- U.S. at ----, 112 S.Ct. at 2830 (concluding that a statute regulating abortion was invalid on its face because "in a large fraction of the cases" in which the statute would operate it would "operate as a substantial obstacle to a woman's choice to undergo an abortion" and therefore placed "an undue burden"). The district court declared that there was "no question" that the "total ban" on physician-assisted suicide for the terminally ill was "an undue burden" on the constitutional right that the district court had discovered. Consequently, the statute was invalid.
 
 
 14
 Secondly, the district court held that the statute violated the Equal Protection Clause of the Fourteenth Amendment, requiring that all similarly situated persons be treated alike. Washington law, enacted in 1992, provides: "Any adult person may execute a directive directing the withholding or withdrawal of life-sustaining treatment in a terminal condition or permanent unconscious condition." Wash.Rev.Code 70.122.030. Any physician who participates in good faith "in the withholding or withdrawal of life-sustaining treatment" in accordance with such a directive is immune from civil or criminal or professional liability. Id. 70.122.051. The district court could see no constitutional distinction between the terminally ill able to direct the withdrawal or withholding of life support and the terminally ill seeking medical aid to end their lives. Accordingly, it found an unequal application of the laws.
 
 
 15
 Washington appeals.
 
 ANALYSIS
 
 16
 The conclusion of the district court that the statute deprived the plaintiffs of a liberty protected by the Fourteenth Amendment and denied them the equal protection of the laws cannot be sustained.
 
 
 17
 First. The language taken from Casey, on which the district court pitched its principal argument, should not be removed from the context in which it was uttered. Any reader of judicial opinions knows they often attempt a generality of expression and a sententiousness of phrase that extend far beyond the problem addressed. It is commonly accounted an error to lift sentences or even paragraphs out of one context and insert the abstracted thought into a wholly different context. To take three sentences out of an opinion over thirty pages in length dealing with the highly charged subject of abortion and to find these sentences "almost prescriptive" in ruling on a statute proscribing the promotion of suicide is to make an enormous leap, to do violence to the context, and to ignore the differences between the regulation of reproduction and the prevention of the promotion of killing a patient at his or her request.
 
 
 18
 The inappropriateness of the language of Casey in the situation of assisted suicide is confirmed by considering what this language, as applied by the district court, implies. The decision to choose death, according to the district court's use of Casey 's terms, involves "personal dignity and autonomy" and "the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." The district court attempted to tie these concepts to the decision of a person terminally ill. But there is no way of doing so. The category created is inherently unstable. The depressed twenty-one year old, the romantically-devastated twenty-eight year old, the alcoholic forty-year old who choose suicide are also expressing their views of the existence, meaning, the universe, and life; they are also asserting their personal liberty. If at the heart of the liberty protected by the Fourteenth Amendment is this uncurtailable ability to believe and to act on one's deepest beliefs about life, the right to suicide and the right to assistance in suicide are the prerogative of at least every sane adult. The attempt to restrict such rights to the terminally ill is illusory. If such liberty exists in this context, as Casey asserted in the context of reproductive rights, every man and woman in the United States must enjoy it. See Yale Kamisar, "Are Laws Against Assisted Suicide Unconstitutional?" 23 Hastings Center Report 32, 36-37 (May-June 1993). The conclusion is a reductio ad absurdum.
 
 
 19
 Second. While Casey was not about suicide at all, Cruzan was about the termination of life. The district court found itself unable to distinguish between a patient refusing life support and a patient seeking medical help to bring about death and therefore interpreted Cruzan 's limited acknowledgment of a right to refuse treatment as tantamount to an acceptance of a terminally ill patient's right to aid in self-killing. The district court ignored the far more relevant part of the opinion in Cruzan that "there can be no gainsaying" a state's interest "in the protection and preservation of human life" and, as evidence of that legitimate concern, the fact that "the majority of States in this country have laws imposing criminal penalties on one who assists another to commit suicide." Cruzan, 497 U.S. at 280, 110 S.Ct. at 2852. Whatever difficulty the district court experienced in distinguishing one situation from the other, it was not experienced by the majority in Cruzan.
 
 
 20
 Third. Unsupported by the gloss on "liberty" written by Casey, a gloss on a gloss, inasmuch as Casey developed an interpretation of "liberty" first elaborated in Eisenstadt v. Baird, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972), and implicitly controverted by Cruzan, the decision of the district court lacks foundation in recent precedent. It also lacks foundation in the traditions of our nation. See Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934) (Cardozo, J.); Lochner v. New York, 198 U.S. 45, 76, 25 S.Ct. 539, 547, 49 L.Ed. 937 (1905) (Holmes, J., dissenting). In the two hundred and five years of our existence no constitutional right to aid in killing oneself has ever been asserted and upheld by a court of final jurisdiction. Unless the federal judiciary is to be a floating constitutional convention, a federal court should not invent a constitutional right unknown to the past and antithetical to the defense of human life that has been a chief responsibility of our constitutional government.
 
 
 21
 Fourth. The district court extrapolated from Casey to hold the statute invalid on its face. That extrapolation, like the quotation from Casey, was an unwarranted extension of abortion jurisprudence, often unique, to a very different field. The normal rule--the rule that governs here--is that a facial challenge to a statute "must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). The district court indeed conceded that there were circumstances in which the statute could operate constitutionally, for example to deter suicide by teenagers or to prevent fraud upon the elderly. The district court did not even attempt the calculation carried out in Casey to show that in "a large fraction of the cases" the statute would operate unconstitutionally. From the declarations before it the district court had at most the opinion of several physicians that they "occasionally" met persons whom the statute affected detrimentally and their recitation of five case histories. There was no effort made to compare this number with the number of persons whose lives were guarded by the statute. The facial invalidation of the statute was wholly unwarranted.
 
 
 22
 Fifth. The district court declared the statute unconstitutional on its face without adequate consideration of Washington's interests that, individually and convergently, outweigh any alleged liberty of suicide. The most comprehensive study of our subject by a governmental body is When Death Is Sought. Assisted Suicide and Euthanasia in the Medical Context (1994). The study was conducted by the New York State Task Force, a commission appointed by Governor Cuomo in 1985, which filed its report in May, 1994. The Task Force was composed of twenty-four members representing a broad spectrum of ethical and religious views and ethical, health, legal, and medical competencies. Its membership disagreed on the morality of suicide. Unanimously the members agreed against recommending a change in New York law to permit assisted suicide. Washington's interest in preventing such suicides is as strong as the interests that moved this diverse commission to its unanimous conclusion. A Michigan commission, set up in 1992, by majority vote in June 1994 recommended legislative change in the Michigan law against assisted suicide and set out a proposed new statute as a legislative option; the commission did not challenge the constitutionality of the existing Michigan legislation. Michigan Commission on Death and Dying, Final Report (1994). Neither the New York nor the Michigan reports were available to the district court. We take them into account on this appeal as we take into account the legal and medical articles cited by the parties and amici as representative professional judgments in this area of law. In the light of all these materials, Washington's interests are at least these:
 
 
 23
 1. The interest in not having physicians in the role of killers of their patients. "Physician-assisted suicide is fundamentally incompatible with the physician's role as healer," declares the American Medical Association's Code of Medical Ethics (1994) Sec. 2.211. From the Hippocratic Oath with its promise "to do no harm," see T.L. Beauchamp and J.F. Childress, Principles of Biomedical Ethics (1993) 330, to the AMA's code, the ethics of the medical profession have proscribed killing. Washington has an interest in preserving the integrity of the physician's practice as understood by physicians.
 
 
 24
 Not only would the self-understanding of physicians be affected by removal of the state's support for their professional stance; the physician's constant search for ways to combat disease would be affected, if killing were as acceptable an option for the physician as curing. See Alexander M. Capron, "Euthanasia in the Netherlands: American Observations," 22 Hastings Center Report 30, 32 (Mar.-Apr.1992). The physician's commitment to curing is the medical profession's commitment to medical progress. Medically-assisted suicide as an acceptable alternative is a blind alley; Washington has a stake in barring it.
 
 
 25
 2. The interest in not subjecting the elderly and even the not-elderly but infirm to psychological pressure to consent to their own deaths. For all medical treatments, physicians decide which patients are the candidates. If assisted suicide was acceptable professional practice, physicians would make a judgment as to who was a good candidate for it. Physician neutrality and patient autonomy, independent of their physician's advice, are largely myths. Most patients do what their doctors recommend. As an eminent commission concluded, "Once the physician suggests suicide or euthanasia, some patients will feel that they have few, if any alternatives, but to accept the recommendation." New York State Task Force, When Death Is Sought, 122. Washington has an interest in preventing such persuasion.
 
 
 26
 3. The interest in protecting the poor and minorities from exploitation. The poor and minorities would be especially open to manipulation in a regime of assisted suicide for two reasons: Pain is a significant factor in creating a desire for assisted suicide, and the poor and minorities are notoriously less provided for in the alleviation of pain. Id. at 100. The desire to reduce the cost of public assistance by quickly terminating a prolonged illness cannot be ignored: "the cost of treatment is viewed as relevant to decisions at the bedside." Id. at 129. Convergently, the reduction of untreated (although treatable) pain and economic logic would make the poorest the primest candidates for physician-assisted and physician-recommended suicide.
 
 
 27
 4. The interest in protecting all of the handicapped from societal indifference and antipathy. Among the many briefs we have received from amici curiae there is one on behalf of numerous residents of nursing homes and long-term care facilities. The vulnerability of such persons to physician-assisted suicide is foreshadowed in the discriminatory way that a seriously-disabled person's expression of a desire to die is interpreted. When the nondisabled say they want to die, they are labelled as suicidal; if they are disabled, it is treated as "natural" or "reasonable". See Carol J. Gill, "Suicide Intervention for Persons with Disabilities: A Lesson in Inequality," 8 Issues in Law & Med. 37, 38-39 (1993). In the climate of our achievement-oriented society, "simply offering the option of 'self-deliverance' shifts a burden of proof, so that helpless patients must ask themselves why they are not availing themselves of it." Richard Doerflinger, "Assisted Suicide: Pro-choice or Anti-Life,?" 19 Hastings Center Report S. 16, S. 17 (Jan.-Feb.1989). An insidious bias against the handicapped--again coupled with a cost-saving mentality--makes them especially in need of Washington's statutory protection.
 
 
 28
 5. An interest in preventing abuse similar to what has occurred in the Netherlands where, since 1984, legal guidelines have tacitly allowed assisted suicide or euthanasia in response to a repeated request from a suffering, competent patient. In 1990, approximately 1.8 per cent of all deaths resulted from this practice. At least an additional .8 percent of all deaths, and arguably more, come from direct measures taken to end the person's life without a contemporaneous request to end it. New York State Task Force, When Death Is Sought, 133-134.
 
 
 29
 Sixth. The scope of the district court's judgment is, perhaps necessarily, indefinite. The judgment of the district court was entered in favor of Jane Roe and John Doe although they were dead. This unheard-of judgment was a nullity. The judgment in favor of James Poe lapsed with his death pending appeal. The judgment in favor of Doctors Glucksberg, Halperin, Preston and Shalit was "insofar as they raise claims on behalf of their terminally ill patients." No such patients were identified by these doctors except patients who were already deceased. Presumably, then, the judgment was behalf of terminally ill patients that these doctors might encounter in the future. The term "terminally ill" was not defined by the court. No class was certified by the court. There is a good deal of uncertainty on whose behalf the judgment was entered.
 
 
 30
 It was suggested in argument that a definition of the terminally ill could be supplied from the Washington statute on the refusal of life-sustaining treatment which does define "terminal condition." Wash.Rev.Code 70.122.020(9). There are three difficulties: "terminal condition" and "terminally ill" are different terms; the examples given by the plaintiffs show considerable variation in whom they considered terminally ill to be; there is wide disagreement in definition of the terminally ill among the states. See New York State Task Force, When Death Is Sought, 23-35. Life itself is a terminal condition, unless terminal condition is otherwise defined by a specific statute. A terminal illness can vary from a sickness causing death in days or weeks to cancer, which Dr. Glucksberg notes is "very slow" in its deadly impact, to a heart condition which Dr. Preston notes can be relieved by a transplant, to AIDS, which Dr. Shalit declares is fatal once contracted. One can only guess which definition of the terminally ill would satisfy the constitutional criteria of the district court. Consequently, an amorphous class of beneficiaries has been created in this non-class action; and the district court has mandated Washington to reform its law against the promotion of suicide to safeguard the constitutional rights of persons whom the district court has not identified.
 
 
 31
 Seventh. At the heart of the district court's decision appears to be its refusal to distinguish between actions taking life and actions by which life is not supported or ceases to be supported. This refusal undergirds the district court's reading of Cruzan as well as its holding that the statute violates equal protection. The distinction, being drawn by the legislature not on the basis of race, gender or religion or membership in any protected class and not infringing any fundamental constitutional right, must be upheld unless the plaintiffs can show "that the legislature's actions were irrational." Kadrmas v. Dickinson Public Schools, 487 U.S. 450, 458, 108 S.Ct. 2481, 2487, 101 L.Ed.2d 399 (1988). The plaintiffs have not sustained this burden.
 
 
 32
 Against the broad background of moral experience that everyone acquires, the law of torts and the law of criminal offenses against the person have developed. "At common law, even the touching of one person by another without consent and without legal justification was a battery." Cruzan, 497 U.S. at 269, 110 S.Ct. at 2846. The physician's medical expertness is not a license to inflict medical procedures against your will. Protected by the law of torts, you can have or reject such medical treatment as you see fit. You can be left alone if you want. Privacy in the primordial sense in which it entered constitutional parlance--"the right to be let alone"--is yours. See Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).
 
 
 33
 Tort law and criminal law have never recognized a right to let others enslave you, mutilate you, or kill you. When you assert a claim that another--and especially another licensed by the state--should help you bring about your death, you ask for more than being let alone; you ask that the state, in protecting its own interest, not prevent its licensee from killing. The difference is not of degree but of kind. You no longer seek the ending of unwanted medical attention. You seek the right to have a second person collaborate in your death. To protect all the interests enumerated under Fifth above, the statute rightly and reasonably draws the line.
 
 
 34
 Compassion, according to the reflections of Prince Myshkin, is "the most important, perhaps the sole law of human existence." Feodor Dostoevsky, The Idiot, 292 (Alan Myers, trans.) (1991). In the vernacular, compassion is trumps. No one can read the accounts of the sufferings of the deceased plaintiffs supplied by their declarations, or the accounts of the sufferings of their patients supplied by the physicians, without being moved by them. No one would inflict such sufferings on another or want them inflicted on himself; and since the horrors recounted are those that could attend the end of life anyone who reads of them must be aware that they could be attendant on his own death. The desire to have a good and kind way of forestalling them is understandably evident in the declarations of the plaintiffs and in the decision of the district court.
 
 
 35
 Compassion is a proper, desirable, even necessary component of judicial character; but compassion is not the most important, certainly not the sole law of human existence. Unrestrained by other virtues, as The Idiot illustrates, it leads to catastrophe. Justice, prudence, and fortitude are necessary too. Compassion cannot be the compass of a federal judge. That compass is the Constitution of the United States. Where, as here in the case of Washington, the statute of a state comports with that compass, the validity of the statute must be upheld.
 
 
 36
 For all the foregoing reasons, the judgment appealed from is REVERSED.
 
 EUGENE A. WRIGHT, Circuit Judge, dissenting:
 
 37
 This case involves the state's power arbitrarily to deprive terminally ill, mentally competent adults of the right to choose how to die. Because RCW 9A.36.060 violates plaintiffs' privacy and equal protection rights, I dissent. The majority's approach subjects such patients to unwanted and needless suffering. See Brief of Amicus Curiae of Ten Surviving Family Members In Support of Physician-Assisted "Suicide."
 
 
 38
 The majority views the asserted right as illimitable because it depends upon the meaning of "terminally ill."[1] But if we were to affirm, our task would not be to specify the parameters of the right. We are limited, as was the district court, to the dispute before us. The majority's "depressed twenty-one year old" is not a party before us.[2] The deceased plaintiff patients were terminally ill, mentally competent adults, entitled to be free from unwarranted state interference in their last days.
 
 A. Due Process
 1. Privacy Right
 
 39
 Planned Parenthood v. Casey, --- U.S. ----, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), defines the scope of protected liberty interests. The Court there explained that:
 
 
 40
 [M]atters [ ] involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.
 
 
 41
 Id. at ----, 112 S.Ct. at 2807. The majority contends that this language is out of context in this case. Yet that general language was not tailored specifically for the abortion context but derived from well-established Supreme Court precedent. The same paragraph explains:
 
 
 42
 Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education.
 
 
 43
 Id. (citation omitted).
 
 
 44
 The district court's application of Casey hardly amounts to "an enormous leap" that does "violence to the context."
 
 
 45
 An aspect of the liberty interest is the right to personal privacy, or a guarantee of certain areas or zones of privacy. Carey v. Population Servs. Int'l, 431 U.S. 678, 684, 97 S.Ct. 2010, 2015, 52 L.Ed.2d 675 (1977) (quotation omitted). This privacy right includes "the interest in independence in making certain kinds of important decisions." Whalen v. Roe, 429 U.S. 589, 599-600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977).
 
 
 46
 The right to die with dignity falls squarely within the privacy right recognized by the Supreme Court. The decision by a terminally ill, mentally competent adult to request physician assistance in hastening death is a highly personal one, directly implicating the right to privacy. The Supreme Court recognized that "[t]he choice between life and death is a deeply personal decision." Cruzan v. Director, Missouri Dept. of Health, 497 U.S. 261, 281, 110 S.Ct. 2841, 2853, 111 L.Ed.2d 224 (1990). The Court declared that the "principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions." Id. at 278, 110 S.Ct. at 2851. Accord In re Quinlan, 70 N.J. 10, 355 A.2d 647, 663 (1976) (privacy right "is broad enough to encompass a patient's decision to decline medical treatment under certain circumstances."); Superintendent v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417, 424 (1977).
 
 
 47
 A constitutional distinction cannot be drawn between refusing life-sustaining medical treatment and accepting physician assistance in hastening death.[3] "[I]f an individual has a constitutionally protected right to refuse lifesaving medical treatment and life sustaining nutrition, it would seem logically impossible to make it a crime for that person to take active steps to terminate his life." 3 Rotunda & Nowak, Treatise on Constitutional Law 388 (1992).[4] Such a distinction yields patently unjust results. For example, a respirator-dependent patient may demand that the respirator be removed when the pain becomes unbearable. Terminally ill patients not dependent on such life support, however, cannot receive physician assistance to end unwanted agony. So says the majority opinion.
 
 
 48
 Along with established precedent, "this Nation's history and tradition" help to define the content of substantive due process. Moore v. East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977). Because medicine is constantly evolving and presenting new legal questions,[5] whether American history and tradition support the right asserted must be answered at a more abstract level than the majority would permit. For example, in Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010 (1967), the Court looked beyond the historical and traditional bars to interracial marriages to the more abstract principles of the "rights essential to the orderly pursuit of happiness by free men."
 
 
 49
 Likewise, we must ask whether American history and tradition reflect the values of self-determination and privacy regarding personal decisions. In the late nineteenth century, the Court wrote: "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others unless by clear and unquestioned authority of law." Union Pac. R. Co. v. Botsford, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891). The right to die with dignity accords with the American values of self-determination and privacy regarding personal decisions.
 
 2. Standard of Review
 
 50
 The applicable standard of review is strict scrutiny.[6] Because a fundamental right is involved, the statute that limits this right can be justified only by a "compelling state interest," Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969), and it must be narrowly drawn to serve only that interest. Aptheker v. Secretary of State, 378 U.S. 500, 508, 84 S.Ct. 1659, 1665, 12 L.Ed.2d 992 (1964).
 
 3. The Statute is Invalid as Applied
 
 51
 The state has an interest in preserving the lives of its citizens. But the state's interest weakens and the individual's right to privacy grows as natural death approaches. In re Quinlan, 70 N.J. 10, 355 A.2d 647, 664 (1976); Superintendent v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417, 426 (1977) (rational decision by terminally ill, competent patient to refuse life-sustaining treatment has no connection with state interest in preserving life).
 
 
 52
 The Washington Legislature is capable of enacting regulations that serve the state's interest in preserving human life, while protecting the fundamental liberties of terminally ill, mentally competent adults. As Washington law now stands, the statute prevents all terminally ill, mentally competent adults from exercising their right to physician-hastened death. Because the legislature can draft laws that would protect plaintiffs' right to privacy, the existing legislation is not narrowly tailored.
 
 
 53
 The district court invalidated the statute on its face. According to plaintiffs' reply brief before the district court and their oral argument before us, they challenge the statute as it is applied to them as well as on its face. I would hold the statute invalid only as it is applied to terminally ill, mentally competent adults.
 
 B. Equal Protection
 
 54
 Washington law permits terminally ill persons to obtain medical assistance in withdrawing life-sustaining treatment. See In re Grant, 109 Wash.2d 545, 747 P.2d 445 (1987); RCW 70.122.010. Yet it prohibits other forms of physician-hastened death for terminally ill, mentally competent adults. Because Washington's laws abrogate the fundamental rights of one group, but not those of a similarly situated group, they must be subjected to strict scrutiny and upheld only if the classifications are suitably tailored to serve a compelling state interest. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).
 
 
 55
 The two groups of patients are similarly situated because they are both comprised of terminally ill, mentally competent adults. As observed by the district court, "[b]oth [groups of] patients may be terminally ill, suffering pain and loss of dignity and subjected to a more extended dying process without some medical intervention, be it removal of life support systems or the prescription of medication to be self-administered." 850 F.Supp. at 1467. There is but one difference: one group can hasten death through withdrawal of life support; the other can do so only with affirmative medical assistance. Washington's disparate treatment drawn on this difference is not suitably tailored to serve a compelling state interest. Therefore, RCW 9A.36.060 violates plaintiffs' right to equal protection.
 
 C. Conclusion
 
 56
 The majority has denied plaintiffs the right to die with dignity. Terminally ill, mentally competent adults, like plaintiff patients, have a fundamental privacy right to choose physician-hastened death. RCW 9A.36.060, as applied to those persons, violates the privacy and equal protection guarantees of the Constitution.
 
 
 57
 I dissent.
 
 
 
 [1]
 A federal district court that recently decided against recognizing the asserted right did not have such definitional concerns. Quill v. Koppell, 870 F.Supp. 78, 84 (S.D.N.Y.1994) ("Plaintiffs are, of course, suggesting a limited form of physician assisted suicide.")
 
 
 [2]
 In any event, the state has a legitimate interest in preserving the life of a "depressed twenty-one year old" because he or she has a significant life expectancy while the terminally ill plaintiffs before the court had only a limited amount of life left. The state's interest in preserving life declines and the individual's right to privacy grows as natural death approaches. In re Quinlan, 70 N.J. 10, 355 A.2d 647, 664 (1976). For a complete discussion of the state's interest in preserving the lives of non-terminally ill adults see Robert Sedler, Constitutional Challenges to Bans on "Assisted Suicide": The View From Without and Within, 21 Hastings Const.L.Q. 777, 790-795 (1994); Robert L. Risley, Ethical & Legal Issues in the Individual's Right to Die, 20 Ohio N.U.L.Rev. 597, 610 (1993)
 
 
 [3]
 Contrary to the majority's assertion, the Cruzan Court did not draw such a distinction. The majority lifts language from Cruzan that indicates only that states have a general interest in prohibiting the assistance of suicide. This begs the question whether a state can prohibit physician-hastened death for terminally ill, mentally competent adults
 
 
 [4]
 Indeed, as Justice Scalia framed the problem in his concurring opinion in Cruzan: "Starving oneself to death is no different from putting a gun to one's temple as far as the common-law definition of suicide is concerned; the cause of death in both cases is the suicide's conscious decision to put an end to his own existence. Of course the common law rejected the action-inaction distinction in other contexts involving the taking of human life as well.... A physician ... could be criminally liable for failure to provide care that could have extended the patient's life, even if death was immediately caused by the underlying disease that the physician failed to treat." 497 U.S. at 296-97, 110 S.Ct. at 2861 (quotations and citations omitted). See also James Rogers, Punishing Assisted Suicide: Where Legislators Should Fear to Tread, 20 Ohio N.U.L.Rev. 647, 650 (1993) (explaining impossibility of distinguishing between letting die and assistance in death)
 
 
 [5]
 "With the development of the new techniques, serious questions as to what may constitute acting in the best interests of the patient have arisen." Superintendent v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417, 423 (1977). "An inadvertent and unintended side effect of medicine's growing effectiveness is that the dying process has been elongated.... [F]or those who are suffering greatly ... it has become harder and harder to die." Timothy E. Quill, M.D., Death and Dignity: Making Choices and Taking Charge 50 (1993)
 
 
 [6]
 The district court applied the "undue burden" standard because "the constitutional rights at issue in this case are analogous to those in Casey and other decisions using an undue burden standard." Compassion in Dying v. State of Washington, 850 F.Supp. 1454, 1463-64 (W.D.Wash.1994). But Casey does not reject the strict scrutiny standard of review in non-abortion cases. Because the instant case does not involve a challenge to a regulation of abortion rights, the traditional strict scrutiny test must be applied