PEOPLE ex rel OAKLAND COUNTY PROSECUTING ATTORNEY v
KEVORKIAN

Docket No. 138155. Submitted March 21, 1995, at Lansing. Decided
     May 12, 1995, at 10:30 A.M. Leave to appeal sought.
     The People of the State of Michigan ex rel the Oakland County
     Prosecuting Attorney brought an action in the Oakland Circuit
     Court against Jack Kevorkian, seeking to permanently enjoin
     him from using or providing any of his suicide machines or
     other similar devices, contrivances, or other modalities or drugs
     on or to any persons seeking to end a human life or from
     conducting any acts to help a patient commit suicide regardless
     of the modality employed. Following a trial, the court, Alice L.
     Gilbert, J., entered an order granting the injunctive relief
     requested. The defendant appealed.

     The Court of Appeals *held:*

     1. The trial court properly denied the defendant's motion for
     summary disposition that was based on the doctrines of collat-
     eral estoppel and res judicata. Although the motion was based
     on a district court's ruling in a related case against the defen-
     dant that assisting suicide is not a crime under the state's laws,
     the dismissal of a prosecution at a preliminary examination
     does not collaterally estop a subsequent civil action involving
     the same facts. In addition, the district court's dismissal has
     been found to be erroneous. *People v Kevorkian,* 447 Mich 436
     (1994).

     2. The trial court had jurisdiction to enjoin the defendant
     and did not err in exercising equity jurisdiction. The fact that
     an act sought to be enjoined is punishable under the criminal
     law does not preclude invoking the jurisdiction of equity where
     other facts afford a basis for the exercise of equitable jurisdic-
     tion. Here, the state's recourse to criminal courts alone may
     not be adequate to restrain the defendant's unlawful acts or

REFERENCES

Am Jur 2d, Criminal Law §§ 321-324; Equity § 57; Judgments
     §§ 732, 736.
Modern status of doctrine of res judicata in criminal cases. 9
     ALR3d 203.

threats thereof that constitute, at a minimum, a public nuisance that affects health, morals, or safety.

Affirmed.

SAAD, J., concurring, stated that the trial court acted properly in response to the defendant's threats to violate the rule of law by helping others to kill themselves. Courts must act to preserve the sanctity of life and to protect life and preserve the rule of law and respect therefor.

1. ESTOPPEL — COLLATERAL ESTOPPEL — CRIMINAL LAW — CIVIL ACTIONS.

Dismissal of a criminal prosecution at a preliminary examination does not raise a bar under res judicata or collateral estoppel to a subsequent prosecution; such a dismissal also does not collaterally estop a subsequent civil action involving the same facts.

2. EQUITY — INJUNCTIONS — JURISDICTION.

Courts of equity generally will not interfere to prevent the breach of a penal statute except to prevent the continuance of a nuisance affecting health, morals, or safety or to protect a public property right or interest; however, the fact that an act sought to be enjoined is punishable under the criminal law will not preclude either the state or an individual from invoking the jurisdiction of equity where other facts afford a basis for the exercise of equitable jurisdiction; where equity would otherwise have jurisdiction, the fact that the Legislature has made such conduct a crime does not oust jurisdiction to enjoin.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Richard Thompson,* Prosecuting Attorney, and *Michael J. Modelski,* Assistant Prosecuting Attorney, for the people.

*Fieger, Fieger & Schwartz, P.C.* (by *Geoffrey N. Fieger* and *Pamela A. Hamway*), for the defendant.

Amicus Curiae:

*Beier Howlett* (by *Daniel C. Devine, Jr.*), for Hemlock of Michigan.

Before: MURPHY, P.J., and MICHAEL J. KELLY and SAAD, JJ.

MURPHY, P.J. The issue before this Court is whether the trial court erred in permanently enjoining defendant from using or providing "any of his 'suicide machines,' or other similar devices, contrivances, or other modalities or drugs (including nonprescription drugs) on, or to, any persons seeking to end a human life, or conducting any acts to help a patient commit suicide regardless of the modality employed." We hold that no error occurred and accordingly affirm the decision of the trial court.

On June 4, 1990, defendant helped Janet Adkins commit suicide. On June 6, 1990, the people filed a complaint for injunctive relief and a motion for a temporary restraining order. The temporary restraining order was not granted, but the trial court did issue an order to show cause why a preliminary injunction should not be issued. At the conclusion of a hearing on June 8, 1990, at which defendant testified, the trial court issued a preliminary injunction temporarily enjoining defendant from using or providing his suicide machines or other devices or drugs in order to help a person seeking to end a human life.

A trial was held regarding the people's request for injunctive relief in January 1991. Although defendant did not testify at trial, his testimony from the June 8, 1990, hearing was admitted as an exhibit. In addition, a statement prepared by defendant was admitted as an exhibit. Numerous other witnesses also testified.

Defendant admitted that he helped Ms. Adkins commit suicide by means of his "suicide machine," which consists of a frame holding three chemical solutions fed into a common intravenous line controlled by a switch and a timer. Defendant admitted that he inserted the intravenous line needle into Ms. Adkins' arm, but testified that Ms. Adkins

activated the switch that turned on the machine and that Ms. Adkins wished to die because she had Alzheimer's disease and feared for the future. He testified that he discussed the matter with Ms. Adkins and her husband. However, he also admitted that he had no clinical training in Alzheimer's disease and was unaware of the progress of the disease in Ms. Adkins or whether modes of treatment were available. He testified that he is certified in anatomic and clinical pathology, that he has been unemployed in medicine since 1982 and living off savings, in part because his actions and theories always have been controversial, and that he has no special training in Alzheimer's disease, geriatric diseases, or neurology. He admitted that the use of his machine is not a medically accepted or recognized procedure. He also stated that he will use his machine in the future in the absence of an injunction preventing him from doing so.

On February 5, 1991, the trial court issued an opinion and order permanently enjoining defendant from using his machine or otherwise assisting in a suicide. The court found as fact that defendant's actions in this case occurred as part of a physician-patient relationship and that his actions must therefore be judged under currently operative standards of medical practice, and not standards that might ensue in the future. The court found that defendant is by education and training a retired pathologist without any experience or any knowledge in the fields of internal medicine, geriatric medicine, psychiatry, neurology, or other areas that might be helpful in diagnosing and managing Alzheimer's disease. The court found that defendant was not professionally qualified to evaluate the physical or emotional status of Ms. Adkins. Moreover, the court found that defendant made no attempt to take a comprehensive medical

history, conduct a physical examination, order any tests, assess Ms. Adkins' medical status, or consult with experts. The court found that Ms. Adkins, who was fifty-four years old, was neither imminently terminally ill nor suffering from pain. After reviewing the videotaped interview conducted by defendant with Ms. Adkins and her husband, the court found that she was coherent, responsive to verbal communication, and without any obvious physical or mental impairment. The court noted reports that she had played tennis within days of her death. Likewise, the videotape demonstrated that defendant made no real effort to discover whether Ms. Adkins wished to end her life, relying largely on the statements of her husband and a few limited responses from Ms. Adkins. The court found that defendant appeared to be in a hurry during the videotaped interview. The court found that Alzheimer's disease was not within the province of defendant's speciality and that his actions did not conform to accepted medical standards. In particular, the court noted in its opinion that defendant had threatened to use his machine again in the future in the absence of an injunction preventing him from doing so.

On appeal, defendant does not challenge any of the trial court's findings of fact. Instead, defendant raises two questions of law.

First, defendant claims that the trial court erred in denying his motion for summary disposition based upon the doctrines of collateral estoppel and res judicata after a district court ruled in a related criminal case against the defendant that assisting suicide is not a crime under the laws of the State of Michigan.

In *People v Hayden*, 205 Mich App 412, 414-415; 522 NW2d 336 (1994), this Court recently reiterated the rule that dismissal of a prosecution at a

preliminary examination raises no bar under res judicata or collateral estoppel to a subsequent prosecution. If so, then we can see no reason why such a dismissal should collaterally estop a subsequent civil action involving the same facts. Moreover, it is now clear that the district court's dismissal of the criminal charge against defendant was erroneous. *People v Kevorkian,* 447 Mich 436; 527 NW2d 714 (1994), cert den sub nom *Hobbins v Kelley,* — US —; 115 S Ct 1795; 131 L Ed 2d 723 (1995). For these reasons, we find no merit to defendant's argument.

Defendant also claims that the trial court lacked jurisdiction to enjoin him from committing a legal act. As indicated above, it is now clear that defendant's claimed legal act was in fact illegal. *Kevorkian, supra.* Alternatively, defendant argues that even if his actions were criminal, injunctive relief should not be available in this case. We disagree.

Courts of equity generally will not interfere to prevent the breach of a penal statute except to prevent the continuance of a nuisance affecting health, morals, or safety or to protect a public property right or interest. See *Portage Twp v Full Salvation Union,* 318 Mich 693, 706; 29 NW2d 297 (1947); *Muskegon Building & Construction Trades v Muskegon Area Intermediate School Dist,* 130 Mich App 420, 429; 343 NW2d 579 (1983). See also 42 Am Jur 2d, Injunctions, § 157, pp 916-918. On the other hand, the mere fact that an act sought to be enjoined is punishable under the criminal law will not preclude either the state or an individual from invoking the jurisdiction of equity whenever other facts afford a basis for the exercise of equitable jurisdiction. Where equity would otherwise have jurisdiction, the fact that the Legislature has made such conduct a crime does not oust jurisdiction to enjoin. "Criminality neither affords

a basis for, nor does it oust the jurisdiction of, the court to grant an injunction." 42 Am Jur 2d, Injunctions, § 157, p 918. See *Garfield Twp v Young,* 340 Mich 616; 66 NW2d 85 (1954); *Dearborn Nat'l Ins Co v Comm'r of Ins,* 329 Mich 107; 44 NW2d 892 (1950); *Bd of Health of Grand Rapids v Vink,* 184 Mich 688; 151 NW 672 (1915); *United States v U S Klans, Knights of Ku Klux Klan, Inc,* 194 F Supp 897 (MD Ala, 1961); *State ex rel Turner v United-Buckingham Freight Lines, Inc,* 211 NW2d 288 (Iowa, 1973); *Chicago v Larson,* 31 Ill App 2d 450; 176 NE2d 675 (1961).

In *Attorney General ex rel Optometry Bd of Examiners v Peterson,* 381 Mich 445, 465-466; 164 NW2d 43 (1969), the Supreme Court held:

> We believe the better rule and the trend of modern authority is that equity may enjoin the unlicensed practice of a profession.
>
> At common law, acts in violation of law constitute a public nuisance. Harm to the public is presumed to flow from the violation of a valid statute enacted to preserve public health, safety and welfare. The attorney general, acting on behalf of the people, is a proper party to bring an action to abate a public nuisance or restrain unlawful acts which constitute a public nuisance. The existence of a criminal or other penalty for the practice of a profession without a license will not oust equity from jurisdiction.

We hold that the trial court did not err in exercising equity jurisdiction in this case. Defendant's conduct before the injunction was entered and his threatened conduct in the future supports the people's claim that recourse to the criminal courts alone may not be adequate to restrain unlawful acts or threats thereof that constitute, at a minimum, a public nuisance that affects health,

morals, or safety. Defendant stated under oath that he would continue to aid in suicides even if his license was revoked. Defendant's actions implicate the criminal law and his words and actions amount to an advertisement for criminal and unethical conduct. Defendant has made clear that he stands ready to assist people in ending their lives. Defendant has made clear that neither the actions of the Legislature, the executive branch, nor the judiciary will sway him from his course. We will see.

Affirmed.

MICHAEL J. KELLY, J., concurred.

SAAD, J. *(concurring)*. I concur in the result of the majority opinion and write separately to express my view on this important topic.

I

### NATURE OF THE CASE

We deal here with the important legal question whether the trial court should have enjoined Dr. Kevorkian from helping others to kill themselves. Because respect for life and for the rule of law goes to the heart of our nation's traditions and the principles we live by, I believe that we must prohibit any person from placing himself above the law by helping people to kill themselves. And, although the judiciary ordinarily will refrain from enjoining criminal misconduct because to do so would appear superfluous, courts must act when someone threatens to violate the rule of law by helping others to kill themselves. The courts must and should act to preserve the sanctity of life and to protect life and preserve the rule of law and respect therefor.

## II

### FACTS

I concur in the majority's recitation of the facts; however, I believe that the following facts deserve emphasis.

Significantly, in response to the unlawful conduct at issue, the Legislature passed a bill outlawing assisted suicide, 1993 PA 3, and the Governor signed the bill into law that same day. MCL 752.1027; MSA 28.547(127). The Michigan Supreme Court has since both upheld the statute against various constitutional challenges and reaffirmed that one who assists another to take his life violates the criminal laws of this state. *People v Kevorkian,* 447 Mich 436; 527 NW2d 714 (1994). Most recently, the parties have filed petitions for certiorari with the United States Supreme Court, which have been denied, sub nom *Hobbins v Kelley,* — US —; 115 S Ct 1795; 131 L Ed 2d 723 (1995). It is against this backdrop of legal developments that reaffirmed the illegality of assisted suicide that we now affirm the decision of the trial court.

## III

### ISSUE

Should a court of general jurisdiction use its extraordinary injunctive powers to prohibit someone from helping another to kill himself where such conduct is both threatened and criminal?

## IV

### ANALYSIS

Though rare, courts have used injunctions against repeated and threatened criminal conduct.

42 Am Jur 2d, Injunctions, § 157, p 917; *State ex rel Turner v United-Buckingham Freight Lines, Inc,* 211 NW2d 288 (Iowa, 1973); *Chicago v Larson,* 31 Ill App 2d 450; 176 NE2d 675 (1961); *United States v U S Klans, Knights of Ku Klux Klan, Inc,* 194 F Supp 897 (MD Ala, 1961); *Garfield Twp v Young,* 340 Mich 616; 66 NW2d 85 (1954).

But why do so here? Because the sanctity of life and the rule of law are, at one and the same time, the most cherished and vulnerable principles of our society and both are directly challenged and would be undermined by the threatened conduct if left unchecked.

On the other hand, compassion for those dying painfully and the concept of individual choice convince some citizens to support euthanasia. Combine these powerful forces with a climate of situational ethics in a world where matters of life and death have become more decisional than natural and to some euthanasia becomes a moral imperative. However, the people of Michigan, through its Legislature, Governor, and Supreme Court, have stated unambiguously that helping another to kill himself is criminal. Therefore, the issue raised by threatened violations of our laws against assisted suicide is: What is the proper response of the courts?

And, it is the answer to this question that mandates that we uphold the trial court's injunction against Dr. Kevorkian's helping others to kill themselves.

The judiciary cannot avoid its responsibility to address questions of life and death. *Quill v Koppell,* 870 F Supp 78 (SD NY, 1994); *Compassion in Dying v Washington,* 49 F3d 586 (CA 9, 1995). Like it or not, these fundamental issues end up before judges who admittedly are more comfortable with and able to answer evidentiary rather than mor-

tality issues. Yet, when faced with threatened violations of life and law, courts cannot remain adiaphorous, particularly where, as here, defendant's conduct strikes at the very heart of both. *Quill, supra; Compassion in Dying, supra.*

Indeed, it is the concomitant centrality and fragility of the principles of sanctity of life and respect for the law,[1] combined with the frequency and ferocity of attacks on these principles, that oblige this Court to place its equity powers squarely on the side of life and law. And this is especially true where, as here, both of these cherished traditions are threatened with one seductively insidious act. So, we affirm the trial court's order to Dr. Kevorkian to obey the law.

---

[1] Judge Noonan recognized the paramount importance of the principles of the sanctity of life and respect for the law in *Compassion in Dying, supra* at 591:

In the two hundred and five years of our existence no constitutional right to aid in killing oneself has ever been asserted and upheld by a court of final jurisdiction. Unless the federal judiciary is to be a floating constitutional convention, a federal court should not invent a constitutional right unknown to the past and antithetical to the defense of human life that has been a chief responsibility of our constitutional government.