Gary LEE, et. al., Plaintiffs,

v.

STATE OF OREGON, et. al., Defendants.

Civ. No. 94–6467–HO.

United States District Court,
D. Oregon.

Aug. 3, 1995.

## OPINION

### (Equal Protection)

HOGAN, Chief Judge.

In November 1994, Oregon voters narrowly approved a ballot initiative that allows a terminally ill adult to obtain a doctor's prescription for a fatal drug dosage for the express purpose of ending their life. The Oregon Death With Dignity Act ("Measure 16")[1] is the first of its kind in this country, and it is an understatement to say that the Act invokes profound questions of constitutional dimension. Plaintiffs claim that Measure 16 violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the Constitution (Counts One, Two, and Four), statutory and First Amendment rights of freedom to exercise religion and to associate (Count Five), and the American with Disabilities Act ("ADA") (Count Three). (Third Amended Complaint, # 170).

Under the United States Constitution and the system it establishes, the resolution of an issue such as the legality of physician assisted suicide is, in the first instance, left to the democratic processes of a state. Although the complexity of life and death decisions may call for legislative participation, the judiciary cannot simply defer to state legislative processes when presented with a law which may not provide adequate constitutional guidance and protection to citizens. A state-sanctioned option designed to hasten death induces hesitation and reflection. It is the court's duty to carefully and conscientiously address any constitutional issues. Compassion, justice, prudence, and fortitude are all ingredients in the law, but the guiding "compass is the Constitution of the United States." *Compassion in Dying v. State of Washington,* 49 F.3d 586, 594 (9th Cir.1995).

Requiring that issues relating to physician assisted suicide be addressed within constitutional limits does not frustrate the authority of citizens to govern themselves. To the contrary, it ensures the integrity of the voting process by recognizing the deeply imbedded constitutional principle that certain fundamental rights may not be dispensed with by a majority vote.

## I. EQUAL PROTECTION CLAUSE

Plaintiffs allege that the provisions of Measure 16 violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution. They argue that Measure 16's classification or coverage to the "terminally ill" is not rationally related to a legitimate state interest.[2]

■ The Fourteenth Amendment commands, in part, that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause does not forbid differentiating between classes of persons. Rather, it simply prohibits the states from treating persons differently who are, in all relevant respects, alike. *Nordling-*

---

1. The term "assisted suicide" shall be used throughout this opinion as a term of art and general description of Measure 16 subject matter.

2. The court has, therefore, limited its analysis and is not deciding whether a heightened or strict scrutiny test may apply if Measure 16 implicates a fundamental liberty interest.

er v. Hahn, 505 U.S. 1, 10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992) (citation omitted).

■ Legislation is presumed valid if a classification drawn by a statute is rationally related to a legitimate state interest. Schweiker v. Wilson, 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981). The Equal Protection Clause allows wide latitude in social legislation. United States Railroad Retirement Board v. Fritz, 449 U.S. 166, 174, 101 S.Ct. 453, 459, 66 L.Ed.2d 368 (1980). A legitimate state interest must encompass the interests of the members of the community at large, as well as disadvantaged and favored classes. Legislative decisionmakers are not required to articulate the rationale supporting a classification, and the state is not required to produce evidence or empirical data to support it. Heller v. Doe by Doe, —— U.S. ——, ——, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). It is irrelevant that the voters rather than a legislative body enacted the statute for purposes of this constitutional review. Citizens Against Rent Control v. City of Berkeley, 454 U.S. 290, 293, 295, 102 S.Ct. 434, 436, 437, 70 L.Ed.2d 492 (1981). Plaintiffs have the burden of proving any violation of the Equal Protection Clause. Burlington Northern Railroad Co. v. Department of Public Service Regulation, 763 F.2d 1106, 1113 (9th Cir.1985).

■ A classification "must be upheld against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." F.C.C. v. Beach Communications, Inc., —— U.S. ——, ——, 113 S.Ct. 2096, 2100, 124 L.Ed.2d 211 (1993). A classification rationally furthers a state interest when there is some fit between the disparate treatment and the legislative purpose. See Katzenbach v. Morgan, 384 U.S. 641, 657, 86 S.Ct. 1717, 1727, 16 L.Ed.2d 828 (1966). When faced with doubts as to the constitutionality of a statute, the court must first determine whether it is fairly possible to interpret the statute in a manner that ren-

ders it valid. Communications Workers of America v. Beck, 487 U.S. 735, 762, 108 S.Ct. 2641, 2657, 101 L.Ed.2d 634 (1988). However, "statutory construction may not be pressed to the point of disingenuous evasion." Id. at 762, 108 S.Ct. at 2657 (quotation omitted).

■ A state is free to create a classification scheme so long as it does not invidiously discriminate. City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (labeled "irrational prejudice"); Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973); Jackson Water Works v. Public Utilities Com'n, 793 F.2d 1090, 1093 (9th Cir.1986). The state may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational. Zobel v. Williams, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982); United States Dept. of Agriculture v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); Nordlinger v. Hahn, 505 U.S. at 18, 112 S.Ct. at 2336. However, the underinclusiveness or overinclusiveness of a classification may be so severe that it cannot be said that the legislative distinction "rationally furthers" the state interest. Burlington Northern Railroad Co. v. Ford, 504 U.S. 648, 653–54, 112 S.Ct. 2184, 2188, 119 L.Ed.2d 432 (1992).

Equal protection analysis is used to determine whether a classification is properly drawn. Plaintiffs argue that there is no legitimate state interest underlying Measure 16, because statistics show that only 2–4% of the terminally ill actually commit suicide. However, as noted, a classification is valid for equal protection purposes as long as there is some "fit" between the disparate treatment and the legislative purpose. On the other hand, intervenor defendants argue that Measure 16 is only the first step toward legalizing physician assisted suicide for others who consent.[3] The Ninth Circuit in discussing

---

**3.** Certain of the defendants would limit the court's analysis of the constitutional issues to the context of the terminally ill class as defined by Measure 16, and the court has so limited its analysis. Nonetheless, the candor of intervenor defendants boldly presents the underlying issue:

what are the boundary lines, if any, to state-sanctioned suicide? While a diagnosis of terminal illness with less that six months to live may be a persuasive rational basis for some to choose suicide, there is little limit to the justifications which can be advanced for state-sanctioned sui-

whether a terminally ill patient had a liberty interest in a "right to die" reasoned:

> If at the heart of liberty protected by the Fourteenth Amendment is the uncurtailable ability to believe and to act on one's deepest beliefs about life, the right to suicide and the right to assistance in suicide are the prerogative of at least every sane adult. The attempt to restrict such rights to the terminally ill is illusory. If such liberty exists in this context, ... every man and woman in the United States must enjoy it.... The conclusion is a *reductio ad absurdum*....

*Compassion in Dying*, 49 F.3d at 591. While the practical effect of a state law may be to create some inequality between particular classes of persons on the ground that the legislature has taken only one step, it cannot create an illusory classification where the reasons for the law apply equally to all members of the public.

Defendants argue that Measure 16 cannot violate plaintiffs' right to equal protection of the laws, because it does not require any action, rather it merely provides an optional procedure. In theory, the consent embodied in Measure 16 equally protects the right of a terminally ill person to go on living and the right to choose to die. This consent is purportedly based on a person's own rational assessment of the quality and value of their life.

As Measure 16 itself recognizes, however, there may be terminally ill persons who are suffering from impaired judgment and yet express a wish to die. Their status is incompatible with autonomy and personal decision-making. Where terminally ill persons are provided the means of hastening death, there is a potential for exposing members of society to life-threatening mistakes and abuses. Therefore, a crucial inquiry under an equal protection analysis is whether the safeguards provided in Measure 16 are sufficient to justify treating terminally ill patients differently than others.

Plaintiffs argue that the "terminally ill" classification denies them equal protection of the laws, because non-terminally ill persons are entitled to certain statutory "protections" under Oregon law which are arbitrarily and irrationally abrogated by Measure 16. Specifically, they point to ORS 163.125, ORS 161.205, ORS 426.070, ORS 677.095, and ORS 677.190.[4] These laws serve to protect vul-

---

cide. Where in the Constitution do we find distinctions between the terminally ill with six months to live, the terminally ill with one year to live, paraplegics, the disabled, or any category of people who have their own reasons for not wanting to continue living?

This could be a slippery slope indeed. The Supreme Court has cautiously and explicitly excluded assisted suicide from the scope of its decisions concerning a "right to die." *Cruzan*, 497 U.S. at 280, 110 S.Ct. at 2852. It has identified the considerations for determining when a right "not readily identifiable in the Constitution's text" is deserving of constitutional protection. *Bowers v. Hardwick*, 478 U.S. 186, 191, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140 (1986). A right must be "implicit in the concept of ordered liberty" so that neither liberty nor justice would exist if it were sacrificed. The right must be "deeply rooted in the Nation's history and tradition." *Id.* at 191–192, 106 S.Ct. at 2844. Courts have considered the historical treatment of suicide in analyzing an alleged constitutional right to assisted suicide, and states have traditionally penalized acts of suicide and assisted suicide. *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. at 294–295, 110 S.Ct. at 2859–60 (Scalia, J., concurring). Traditionally, physician assisted suicide has been regarded as

contrary to the Hippocratic Oath which states in part:

> To please no one will I prescribe a deadly drug, nor give advice which may cause his death.

STEADMAN'S MEDICAL DICTIONARY (5th Unabridged Lawyers' Ed), at 650.

It is noteworthy that the Declaration of Independence refers to life as "inalienable," presumably a benefit that cannot be easily waived or forfeited. The Ninth Circuit recognized that: "[t]ort law and criminal law have never recognized a right to let others enslave you, mutilate you, or kill you, even with your consent." *Compassion in Dying*, 49 F.3d at 594.

The Ninth Circuit further stated:

> In two hundred and five years of our existence no constitutional right to aid in killing oneself has ever been asserted and upheld by a court of final jurisdiction. Unless the federal judiciary is to be a floating constitutional convention, a federal court should not invent a constitutional right unknown to the past and antithetical to the defense of human life that has been a chief responsibility of our constitutional government. *Id.* at 591.

4. ORS 163.125 establishes the crime of manslaughter in the second degree for recklessly or intentionally causing or aiding another person to

nerable people who might otherwise seek suicide in response to treatable depression, mental illness, or coercion. After noting that a majority of states have laws imposing criminal penalties on one who assists a suicide, the Supreme Court has stated: "We do not think a State is required to remain neutral in the face of an informed and voluntary decision by a physically able adult to starve to death." *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 280, 110 S.Ct. 2841, 2852, 111 L.Ed.2d 224 (1990). The state interests underlying these statutes include preservation of life and protection against suicide.

The state defendants claim the following interests in creating an exception for terminally ill persons under Measure 16: (1) avoiding unnecessary pain and suffering;[5] (2) preserving and enhancing the right of competent adults to make their own critical health care decisions; (3) avoiding tragic cases of attempted or successful suicides in a less humane and dignified manner; (4) protecting the terminally ill and their loved ones from financial hardships they wish to avoid; and (5) protecting the terminally ill and their loved ones from unwanted intrusions into their personal affairs by law enforcement officers and others. (Defendants' Reply Memorandum in Support of Motion for Summary Judgment (# 172) at 16).

It is "rational" to conclude that competent terminally ill persons may not want protection from their suicidal impulses. Preventing suicide may simply mean prolonging suffering for a person who has no hope of a significant natural life ahead.[6] Therefore, it may be a valid public policy to allow choice based on principles of autonomy and self-determination—the right to control one's body, destiny, and health care.

■■■ The basic premise underlying the state's argument that Measure 16 is constitutional is that terminally ill persons consent to the drug overdose. Thus, the measure excludes the "incompetent" from opting for assisted suicide, because their consent cannot be deemed voluntary or valid. The problem is that the procedures designed to differentiate between the competent and incompetent are not sufficient. For example, one safeguard recognized in withdrawal of life support cases, but not under Measure 16, is the involvement of third parties to provide a "substituted judgment" on behalf of an incompetent person. The third parties, usually family members or relatives, act as proxies to implement what a patient would choose under particular circumstances. *Cruzan,* 497 U.S. at 279–80, 110 S.Ct. at 2852; ORS 127.510(1) (provides that a capable adult may designate in writing a competent adult to serve as attorney-in-fact for health care and to direct withdrawal of life support).

Another example is ORS 426.070, which provides a procedure for civil commitment of mentally ill persons who, because of a mental disorder, are dangerous to themselves. *See also* ORS 426.005(1)(d)(A). Under this procedure, a "treating" physician licensed by the Board of Medical Examiners may temporarily hold such individuals in a health care facility for up to twelve hours if that physician believes them to be dangerous to themselves, and in conjunction with a qualified mental health professional, may hold them up to five days. ORS 426.231; ORS 426.232. A judge is required to appoint at least one qualified "examiner" to evaluate the patient and provide a report prior to a commitment

---

commit suicide. ORS 161.205 provides that a person acting under a reasonable belief that another person is about to commit suicide may use reasonable physical force to thwart the result. ORS 677.190(1) provides that the Board of Medical Examiners for the state of Oregon may take disciplinary action against a physician for "unprofessional or dishonorable conduct," which includes any conduct contrary to recognized standards of ethics of the medical profession or which might constitute a danger to the health or safety of a patient. *See also* ORS 677.188(4)(a). Two of these statutes are more fully discussed in the text of this opinion: ORS 426.070 *et seq.,*

establishing the procedure for civil commitment, and ORS 677.095, establishing a physician's standard of care.

**5.** The court notes that although defendants argue that one purpose of Measure 16 is to end intractable pain, the statute does not require any showing of pain to acquire a lethal prescription.

**6.** It is equally "rational" to conclude that a person could never receive a benefit from self-destruction.

hearing. ORS 426.110; ORS 426.120. A qualified examiner is defined as a physician licensed to practice psychiatry or who is certified to make examinations by the Mental Health and Developmental Disability Services Division. ORS 426.110(2)(b). None of these safeguards apply to Measure 16.

Without the protections provided in other situations, Measure 16 requires "attending" and "consulting" physicians who may not be psychiatrists, psychologists, or counselors to make an evaluation whether a condition is causing impaired judgment [7], if a patient is depressed, or suffering from a psychiatric or psychological disorder. This is the final evaluation for persons, whom the physicians believe, are not suffering from impaired judgment. The Measure also relies on them to decide when a person's request is voluntary and not the product of undue influence.[8] There is no requirement that the person consult a certified social worker or other specialist to explore social services which might assist the person to live in greater comfort. Also, it is the treating physician's responsibility to inform the person of "feasible alternatives," including "comfort care, hospice care and pain control." (§ 3.01(2)(e)).

It is undisputed that one of the factors that motivates suicide is depression. Suicide requests may represent a plea for help by a distraught person in physical and emotional pain. Under Measure 16, a treating physician must determine when a person is beyond help and not merely suffering from treatable depression common in people with terminal illnesses. Seriously ill people commonly suffer from alienation, guilt and feelings of unworthiness. They are susceptible to even subtle suggestions that reinforce these feelings. Clinical imponderables such as severity of pain, gradations of suffering, and prognosticating accurately are difficult in themselves. They may be compounded when a person seeks assisted suicide, or the treating physician is frustrated or inclined to impose their values on a person.[9] The problem of inadequate mental evaluation is compounded by imprecision in defining "terminal disease." Even for physicians who specialize in treating a terminal disease, no precise definition is medically or legally possible, since only in hindsight is it known with certainty when someone is going to die. As the Ninth Circuit noted, the terminally ill category is "inherently unstable." *Compassion in Dying*, 49 F.3d at 590.

Measure 16 does not provide for an independently chosen consulting physician to confirm that a person is capable and acting voluntarily, rather it is the attending physician's responsibility to make the referral. (§ 3.01). This does not assure a second, independent medical examination to closely and carefully scrutinize a person's "qualifica-

7. Measure 16 defines an "attending" physician as one who is primarily responsible for the care and treatment of a terminal disease. It defines "consulting" physician as one who is qualified by specialty or experience to make a professional diagnosis and prognosis regarding a patient's disease. These physicians will be referred to as "treating" physicians for purposes of this opinion. They are required to evaluate whether a patient may be suffering from a psychiatric or psychological disorder, or depression causing impaired judgment. (§ 3.03).

8. Measure 16 does provide some protection from undue influence. Section 4.02(2) provides:

A person who coerces or exerts undue influence on a patient to request medication for the purpose of ending the patient's life, or to destroy a rescission of such a request, shall be guilty of a Class A felony.

9. The Ninth Circuit has stated that "[p]hysician-assisted suicide is fundamentally incompatible with the physician's role as healer." *Compassion in Dying*, 49 F.3d at 592. In addition, it noted that a physician's search for ways to combat disease would be affected, "if killing were as acceptable an option for the physician as curing." *Id.*

The Ninth Circuit recognized that protecting vulnerable patients from psychological pressure to consent to suicide was important. *Id.* It reasoned that for all medical treatments including assisted suicide, physicians decide which patients are candidates. "Physician neutrality and patient autonomy, independent of their physician's advice, are largely myths. .. Once the physician suggests suicide or euthanasia, some patients will feel that they have few, if any alternatives, but to accept the recommendation." *Id.* The court also discussed the particular vulnerability of the poor and the disabled. Finally, the Ninth Circuit mentioned preventing the abuse that occurs in the Netherlands where assisted suicide is permitted in response to repeated requests from a suffering, competent patient.

tion" to use Measure 16. The Measure provides a person with a short time for reflection, no less than 15 days between the initial oral request and the writing of the prescription and no less than 48 hours between the patient's written request and the writing of the prescription. (§ 3.08). The possibility that a judgment impairing disorder will resolve itself within this short time frame is unlikely.[10] Also, from a broader view, there is no independent oversight for the decision and implementation of an assisted suicide request by medical professionals, i.e., review by a probate court, as there is with civil commitment.[11] With death at issue under Measure 16, the court is unable to conceive of a set of facts under which it would be rational to not require mental and social evaluations by appropriately trained professionals.

■■■ ORS 677.095 establishes the standard of care for physicians who treat patients outside Measure 16 parameters. It provides, in relevant part: "A physician ... has the

10. As noted previously, the classification of a terminally ill patient with six months or less to live is only one of a myriad of classifications which would support a rational basis for a decision to commit suicide. Would the same procedures for determining competency and the same 15 day waiting period withstand constitutional scrutiny as applied to a 19 year old paraplegic contemplating suicide? Again, where in the Constitution do we find the compass to chart our way through this state-sanctioned dispensation of death?

11. In fact, under Measure 16 there is no family notification requirement at the point of receiving the physician-prescribed drug. Section 3.05 provides:

The attending physician shall ask the patient to notify next of kin of his or her request for medication pursuant to this Act. A patient who declines or is unable to notify next of kin shall not have his or her request denied for that reason.

12. Measure 16's "Immunities and Liabilities" section provides in relevant part:
§ 4.01 Immunities
Except as provided in Section 4.02:
(1) No person shall be subject to civil or criminal liability or professional disciplinary action for participating in good faith compliance with this Act.... (3) No request by a patient for or provision by an attending physician of medication in good faith compliance with the provisions of this Act shall constitute neglect for any purpose of law....

duty to use that degree of care, skill and diligence which is used by ordinarily careful physicians ... in the same or similar circumstances in the community of the physician ... or a similar community." An Oregon physician's actions are judged by the generally accepted and ordinary level of skill expected by the medical profession. For example, this standard applies to an Oregon physician's conduct related to withdrawal of life support. ORS 127.560(1)(b). On the other hand, Measure 16 adopts a subjective "good faith" standard of care for a physician's participation under the Act.[12] An Oregon appellate court has expressly rejected the insertion of the "good faith" concept into the usual consideration of whether physicians exercise reasonable care. *Ellis v. Springfield Women's Clinic, P.C.,* 67 Or.App. 359, 678 P.2d 268, 270, *rev. den.,* 297 Or. 228, 683 P.2d 91 (1984). In remanding for a new trial, the Oregon Court of Appeals stated: "The introduction of that concept allows the jury to consider the motivations of the defendants.

The "participation" described in Section 4.01(1) includes these acts of the "attending physician":

(1) Making the initial determination whether a patient has a terminal disease (§ 3.01(1));

(2) Making the initial determination whether a patient is capable and has voluntarily made the request for medication to end his or her life (§ 3.01(1));

(3) Informing the patient of the potential risks associated with taking the medication to be prescribed, and the probable result of taking the medication (§ 3.01(2));

(4) Referring the patient to counseling if it is believed a patient may be suffering from a psychiatric or psychological disorder, or depression causing impaired judgment (§ 3.03);

(5) Verifying that the patient is making an informed decision immediately prior to writing the prescription for a lethal dose of medication (§ 3.04); and

(6) Prescribing a lethal dose of medication, except to patients who may be suffering from a psychiatric or psychological disorder, or depression causing impaired judgment (§ 3.03).

"Participation" also includes acts of "consulting physicians" in confirming a diagnosis, determining whether a patient is capable of acting voluntarily and has made an informed decision; and the acts of a state licensed psychiatrist or psychologist who performs psychological counseling. (§ 3.02, § 1.01(4), § 3.03).

Such a consideration has no place in an action for ordinary negligence...." *Id.*, 678 P.2d at 270.

Is there a rational basis for Oregon to immunize physicians from liability for actions taken in "good faith" under Measure 16, irrespective of any medical community standard which applies to their actions outside Measure 16? The plain inference from Measure 16 is that it is irrelevant whether physicians objectively act reasonably, or instead act negligently. The court finds that there is no set of facts under which it would be rational for terminally ill patients under Measure 16 to receive a standard of care from their physicians under which it did not matter whether they acted with objective reasonableness, according to professional standards. This defect goes to the very heart of the state's reliance on a person's consent to die. The physician is allowed to negligently misdiagnose a person's condition and competency and negligently prescribe a drug overdose, so long as those actions are in "good faith." This distinction in the physician's standard of care under Measure 16 is not rationally related to any legitimate state interest.[13]

▮ Any state interest which underlays Measure 16 is furthered when a person takes a lethal drug dosage. Yet, there is no requirement that the person take the lethal overdose at the time of the prescription or under the supervision of a physician. It provides that the attending physician may prescribe drugs, but does not limit that prescription to drugs which must be ingested. A prescription may be taken intravenously or a physician may establish a device for releasing the drug by a switch or gas mask. These possibilities subject a vulnerable person to potential abuse at the hands of others, and without the person's knowledge or consent.

Measure 16 does nothing to ensure that the decision to commit suicide is rationally and voluntarily made at the time of death. As a result, Measure 16 purports to recognize a competent terminally ill person's choice to obtain the means to end their life should they commit suicide while competent, incompetent, or unduly influenced at some future time, including hours, days, weeks, or months later. A person decides when, where, and most important, whether to take the prescribed drug without any legal protection.

There is no set of facts under which it would be rational to conclude that a state may sanction providing people the means to commit suicide without consideration of their circumstances at the time of the suicide. This is not simply a matter of an "imperfect fit" between the classification of "terminally ill patient" and a goal of permitting assisted suicide. Given the imprecision and inadequacy of protections leading to the prescription of drugs, the relationship between Measure 16's classification and the goal of permitting assisted suicide is too attenuated without some protection at the time of taking the fatal drug dosage.

Measure 16 provides a means to commit suicide to a severely overinclusive class who may be competent, incompetent, unduly influenced, or abused by others. The state interest and the disparate treatment are not rationally related and Measure 16, therefore, violates the Constitution of the United States.[14]

## II. OTHER CLAIMS

It is not necessary to decide motions related to plaintiffs' Due Process (Count Two), Freedoms of Association and Exercise of Religion (Count Five), ADA (Count Three), and void for vagueness (Count Four) claims.

---

**13.** Again, to underscore the constitutional defect in Measure 16, one only need contemplate the same procedures as applied to a classification based upon disability. Would the suspension of the duty of reasonable care otherwise owed by a physician to their disabled patient withstand an equal protection challenge to physician assisted suicide for that patient?

**14.** Plaintiffs did not file a separate motion for summary judgment. They argued, in effect, that

if defendants admitted certain facts related to the adequacy of the Measure 16 safeguards, then they would be entitled to summary judgment. (Plaintiffs' Brief in Opposition to Defendants' & Intervenors' Motions to Dismiss & For Summary Judgment (# 168) at 2–4). The court construes that pleading (# 168) as plaintiffs' motion for summary judgment. It is not necessary to decide factual issues to grant summary judgment in plaintiffs' favor on the equal protection claim.

## III. CONCLUSION

Individuals and their families and physicians make decisions regarding dying every day, and with limited legal guidance. The fact that people often consult their physicians in this situation is a good argument that assisted suicide is viewed most appropriately as a personal medical matter. Certainly privacy is an important right that people cherish and enjoy.

However, private medical matters become affairs of government when the state sanctions them. It is precisely because the state of Oregon decided to sanction assisted suicide with its irrevocable consequences that the process must withstand constitutional scrutiny.

Measure 16 singles out terminally ill persons who want to commit suicide and excludes them from protection of Oregon laws that apply to others. Residents of Oregon are entitled to protection from committing suicide if found to be a danger to themselves, and after evaluation by a psychiatrist or other state certified mental health specialist. Under this involuntary commitment procedure, "treating physicians," those who treat physical ailments, are not recognized as sufficiently qualified to evaluate their patient's mental impairments, except in emergency and temporary circumstances. Under Measure 16, the very lives of terminally ill persons depend on their own rational assessment of the value of their existence, and yet there is no requirement that they be evaluated by a mental health specialist. Treating physicians may not be sufficiently qualified alone to evaluate mental impairments for the general public, but are given the significant role of deciding whether their patient may be suffering from a "psychiatric or psychological disorder or depression causing impaired judgment." For some, this is their only and final mental evaluation. In addition, these physicians may make this mental evaluation, and perform other responsibilities under Measure 16 based on a subjective, good faith belief. Contrary to the physician's "reasonable" standard of care for other patients,

under Measure 16 there is no bar to a physician acting negligently. In addition, Measure 16 abandons the terminally ill person at the time the physician provides a lethal prescription. It fails to even acknowledge the most critical time, that of death. It provides a means to commit suicide to people who may be competent, incompetent, unduly influenced, and/or abused at the time of death. There is no distinction.

One Supreme Court justice has emphasized the importance of the Equal Protection Clause in protecting persons from substantively unreasonable laws:

> What protects us . . . from being assessed a tax of 100% of our income above the subsistence level, from being forbidden to drive cars, or from being required to send our children to school for 10 hours a day. . . . Our salvation is the Equal Protection Clause, which requires the democratic majority to accept for themselves . . . what they impose on you and me.[15]

Measure 16 withholds from terminally ill citizens the same protections from suicide the majority enjoys. In the process, it has lowered standards and reduced protections to a degree that there is little assurance that only competent terminally ill persons will voluntarily die. The majority has not accepted this situation for themselves, and there is no rational basis for imposing it on the terminally ill.

One difficulty with Measure 16 is its inability to limit "rational suicide" to the hard cases. The suffering of some competent, terminally ill persons gives rise to compassionate arguments. However, as in other areas of law, people have not been permitted to relinquish important interests without careful scrutiny. In addition, Measure 16 is not just about whether someone can legally commit suicide, rather it concerns suicide with state involvement. The court has considered the extent to which permitting assisted suicides in the hard cases may lead to the premature deaths of terminally ill persons who may actually want to live. With state-sanctioned and physician assisted death at

---

15. *Cruzan,* 497 U.S. 261, 300, 110 S.Ct. 2841, 2862–63, 111 L.Ed.2d 224 (1990) (Scalia, J., concurring).

issue, some "good results" cannot outweigh other lives lost due to unconstitutional errors and abuses.