Timothy E. QUILL, M.D.; Samuel C. Klagsbrun, M.D.; and Howard A. Grossman, M.D., Plaintiffs,

v.

G. Oliver KOPPELL, Attorney General of the State of New York; Mario M. Cuomo, Governor of the State of New York; and Robert M. Morgenthau, District Attorney of New York County, Defendants.

No. 94 Civ. 5321 (TPG).

United States District Court, S.D. New York.

Dec. 15, 1994.

Perkins Coie, Seattle, WA, (Kathryn L. Tucker, David J. Burman, Thomas L. Boeder, of counsel) and Hughes Hubbard & Reed, New York City (Carla A. Kerr and Tracy E. Poole, of counsel), for plaintiffs.

G. Oliver Koppell, Atty. Gen. of the State of NY, Michael S. Popkin, Asst. Atty. Gen., and Robert M. Morgenthau, Dist. Atty., New York County, New York City (Mark Dwyer and James M. McGuire, Asst. Dist. Attys., of counsel), for defendants.

New York State Catholic Conference, Albany, NY (Michael L. Costello, Richard E. Barnes, Clarke D. Forsythe, and Paul Benjamin Linton, of counsel), amicus curiae.

Legal Center for the Defense of Life, New York City (Michael P. Tierney, John M. McSherry, and Walter T. Clark, of counsel), amicus curiae.

### OPINION

GRIESA, Chief Judge.

New York law makes it a crime to aid a person in committing suicide, or in attempting to commit suicide. Plaintiffs urge that these provisions violate the United States Constitution, to the extent that they apply to situations where a physician aids the commission of suicide by a mentally competent, terminally ill adult wishing to avoid continued severe suffering, by prescribing a death-producing drug which the patient takes. Plaintiffs claim that a person has a constitutional right to terminate his life under these circumstances, and that a physician has a corresponding constitutional right not to be prosecuted for aiding a patient in the exercise of the patient's right.

Plaintiffs move for a preliminary injunction against the enforcement of the relevant statutes, §§ 125.15(3) and 120.30 of the New York Penal Law, to the extent they apply to physicians who give the kind of assistance described above. Defendants oppose plaintiffs' motion and cross-move for judgment on the pleadings dismissing the action.

Plaintiffs' motion for preliminary injunction is denied. Defendants' cross-motion to dismiss the action is granted. The motion to dismiss will be treated as one for summary judgment since the court has considered matters outside the pleadings—i.e., declarations filed on the motion for preliminary injunction. There is no dispute on the essential facts and the issues presented are ones of law.

### The Parties

The action was commenced on July 20, 1994. The original complaint named three physician plaintiffs, Timothy E. Quill, Samuel C. Klagsbrun, and Howard A. Grossman. There were also three patient plaintiffs who asserted that they were terminally ill and wished to have the assistance of physicians in committing suicide. All three of the patient plaintiffs have now died, leaving only the three physician plaintiffs.

The original complaint named only the Attorney General of the State of New York as a defendant. However, it was argued that the Attorney General was not the proper defendant because he was not responsible for prosecutions under the criminal laws of the State. The complaint has now been amended to add as defendants Governor Mario M. Cuomo and New York County District Attorney Robert M. Morgenthau. There is no longer any question about the fact that there are sufficient defendants present to allow the issues in the case to be litigated.

Amicus curiae briefs in opposition to plaintiffs' position have been filed by the New York State Catholic Conference and the Legal Center for the Defense of Life.

### The Relevant Record

#### The Original Complaint

The original complaint of July 20, 1994 contained, among other things, allegations that the three patient plaintiffs were mentally competent adults; that they were in the terminal stages of fatal illnesses; that they faced progressive loss of bodily function and integrity as well as increasing suffering; and that they desired medical assistance in the

form of medications prescribed by physicians to be self-administered for the purpose of hastening death.

As to the three physician plaintiffs, the complaint alleged that, in the regular course of their medical practice, they treated terminally ill patients who requested assistance in the voluntary self-termination of life; that under certain circumstances it would be consistent with the standards of these physicians to prescribe medications to such patients which would cause death, since without such medical assistance these patients could not hasten their deaths in a certain and humane manner.

The original complaint alleged that the patient plaintiffs have a constitutional right under these circumstances to terminate their lives with this type of medical assistance; and that since the New York Penal Law makes it a crime to render such assistance, these provisions violate the constitutional rights of both the patient plaintiffs and the physician plaintiffs, specifically rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

### Amendments to the Complaint

An amended complaint was filed on October 14, 1994. By this time, two of the three patient plaintiffs had died. The allegations about the remaining patient plaintiff were carried over into the amended complaint, as were the claims of the physician plaintiffs.

The second amended complaint was filed October 20, 1994. It was essentially the same as the previous complaint except for naming New York County District Attorney Robert M. Morgenthau as a defendant.

Subsequently, the third patient plaintiff died, thus leaving the three physicians as the only plaintiffs.

An answer was filed in August 1994 to the original complaint denying that plaintiffs have any valid claim. No amended answers were filed responding to the amended complaints, but the court deems the original answer to be a sufficient denial of plaintiffs' claims.

### Declarations Filed On Motion For Preliminary Injunction

The motion for preliminary injunction was filed on September 16, 1994. In support of the motion, each of the three patient plaintiffs submitted declarations which confirmed the allegations in the complaint and added details about their diseased conditions and suffering.

The three physician plaintiffs have submitted declarations affirming their belief that proper and humane medical practice should include the ability to prescribe medication which will enable a patient to commit suicide under the circumstances described in this case.

A declaration by Quill also describes the following incident. In 1990 he treated a terminally ill patient, who feared a lingering death and who apprised Quill that she would act on her own to hasten death if he refused to assist her to do so. Quill made barbiturates available to the patient, which she could use to induce sleep, but which she could also take to end her life by an overdose at the point she desired to do so. She agreed to meet with Quill prior to taking any overdose. The patient reached the point where she desired to end her life. She met with Quill "to insure that all alternatives had been explored," after which she took the overdose and died. Quill was not present at the time of death. Subsequently, Quill wrote an article in the New England Journal of Medicine describing these events. This led to what Quill describes as a "very public criminal investigation" in New York State, and presentation to a grand jury. Quill testified before the grand jury, as did other witnesses. The grand jury did not indict.

The other two physician plaintiffs, Klagsbrun and Grossman, describe in their declarations specific incidents when terminally ill patients wished assistance in hastening death. Each doctor asserts that he refrained from rendering such assistance because of possible prosecution under the New York statutes.

### The Statutes

Section 125.15(3) of the New York Penal Law provides in relevant part:

A person is guilty of manslaughter in the second degree when:

.   .   .   .   .

3. He intentionally ... aids another person to commit suicide.

Section 120.30 provides:

A person is guilty of promoting a suicide attempt when he intentionally ... aids another person to attempt suicide.

Violation of either statute is a felony.

Plaintiffs are not seeking to strike down these statutes in their entirety. Plaintiffs claim that the statutes are unconstitutional only insofar as they apply to the type of physician assisted suicide at issue in this case. Both plaintiffs and defendants agree that, if a physician renders the type of assistance described here, he will violate § 125.15(3) where actual death by suicide occurs, and § 120.30 where the patient attempts to commit suicide and fails.

## DISCUSSION

**Justiciability**

■ Defendants assert that there is no justiciable case or controversy as required by Article III of the Constitution. According to defendants, plaintiffs show nothing more than a speculative possibility of prosecution, rather than any actual threat of prosecution.

The court does not agree with these assertions. The relevant law is well set forth in *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). There the Supreme Court dealt with a constitutional challenge to certain Arizona agricultural labor regulations. The case was brought by a union and parties connected with the union. The Court held that certain of the plaintiffs' claims were justiciable and certain were not. The Court stated that when contesting the constitutionality of a criminal statute it is not necessary that the plaintiff first expose himself to actual prosecution. When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution, a sufficient controversy is presented. On the oth-

er hand, where there are no fears of prosecution except those which are imaginary or speculative, there is no basis for federal court action. "Abstract questions" are not justiciable. *Id.* at 297–99, 99 S.Ct. at 2308–10.

In *Babbitt* the Court upheld federal jurisdiction over claims where (1) the plaintiffs asserted both the intention and the constitutional right to engage in conduct which would violate the regulations, and (2) the state had not disavowed the intention of imposing criminal penalties. Thus the plaintiffs were "not without some reason in fearing prosecution," and the positions of the parties were "sufficiently adverse" to present a proper case. *Id.* at 302–03, 99 S.Ct. at 2310–11.

As to the claims in *Babbitt* held not to be justiciable, the Court found that it was uncertain whether the particular activities involved would actually give rise to a problem under the regulations. The factual pattern which might develop was unclear. *Id.* at 303–04, 99 S.Ct. at 2311–12.

Another instructive case is *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). This was a companion abortion case to *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). In *Doe*, the plaintiffs challenged the Georgia anti-abortion statute. The Court held, among other things, that the claim of the physician plaintiffs presented a justiciable controversy. This was true despite the fact that none of them had been prosecuted or threatened with prosecution. The Court pointed out, 410 U.S. at 188, 93 S.Ct. at 745–46:

The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.

On the basis of these authorities, the court holds that the instant case presents a justiciable controversy under Article III of the Constitution. The three physician plaintiffs seek to carry on activities which they con-

tend are within their constitutional rights and which would violate the New York Penal Law. This is not a case about some activity in which a plaintiff might possibly engage and which might create a hypothetical issue of criminal liability. The physician plaintiffs credibly assert that they have had cases and continue to have cases in which their services are urgently sought to assist in the commission of suicide in the way described in this case. As to whether there is a threat of prosecution for so assisting, there has been the grand jury proceeding about plaintiff Quill. Although no indictment was returned, the State has by no means disavowed the intention of acting against physicians in future cases. Indeed, the State has in the present action vigorously defended its right to apply the statutes to such conduct. Thus, there is a credible threat of prosecution giving rise to sufficiently adverse positions so that a justiciable controversy exists. What is presented here is no mere abstract question.

This is particularly true since the issue of physician assisted suicide is being pressed by segments of the medical community and has sparked sharp public debate. It is most unlikely that the conduct at issue in this case would be ignored by the law enforcement authorities.

It is appropriate to note that the primary right claimed is that of the patient—*i.e.,* the right to decide to terminate one's life and to do so by suicide. However, if such a constitutional right resides in the patient, then there would be a corresponding constitutional right of the physician not to be prosecuted for assisting in the exercise of the patient's constitutional right. The physician plaintiffs in the present case have standing to raise the whole range of issues—both as to the patient's asserted right to terminate his life and the physician's right to be free from prosecution for rendering assistance. *See Doe,* 410 U.S. at 188, 93 S.Ct. at 745–46.

**The Due Process Issue**

■ The Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law." It is now established that there are certain subjects which are so fundamental to personal liberty that governmental invasion is either entirely prohibited or sharply limited. One recent articulation of this concept by the Supreme Court, which is strongly relied upon by plaintiffs, is contained in the plurality opinion in *Planned Parenthood v. Casey,* —— U.S. ——, ——, 112 S.Ct. 2791, 2807, 120 L.Ed.2d 674 (1992).

> Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education.... These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.

*Casey* confirmed the holding in *Roe v. Wade* that the Fourteenth Amendment protects a woman's decision to abort a pregnancy in the pre-viability stage.

Plaintiffs also rely on the Supreme Court decision in *Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). In that case a woman suffered an accident, after which she could only be kept alive by artificial feeding and hydration. She lost her cognitive faculties, and apparently had no possibility of recovery. Her parents desired to have the life-sustaining apparatus withdrawn. The Supreme Court of Missouri held that it was necessary, before such a step could be taken, to show by clear and convincing evidence that the injured woman would have desired withdrawal of the medical devices, and further held that such evidence was lacking.

Although the United States Supreme Court, in reviewing the case, did not provide a single convenient statement of the question before it, a fair summary of the issues would appear to be whether the injured woman had a constitutional right requiring the hospital to withdraw life-sustaining treatment; whether this right could be exercised on behalf of the woman by her parents; and

whether the exercise of this right was unduly hampered by the evidence rule imposed by the state court. In approaching these questions the Supreme Court stated:

> The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions.

*Id.* at 278, 110 S.Ct. at 2851. The Court went on to discuss the specific issue of whether this general right to refuse treatment would apply where such refusal might lead to death.

> Petitioners insist that under the general holdings of our cases, the forced administration of life-sustaining medical treatment, and even of artificially delivered food and water essential to life, would implicate a competent person's liberty interest. Although we think the logic of the cases discussed above would embrace such a liberty interest, the dramatic consequences involved in refusal of such treatment would inform the inquiry as to whether the deprivation of that interest is constitutionally permissible. But for purposes of this case, we assume that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition.

*Id.* at 279, 110 S.Ct. at 2852. Thus, the Court stopped short of actually deciding that there is a constitutional right to terminate medical treatment necessary to sustain life, although the Court *assumed* the existence of such a right for the purpose of going on to the other issues in the case. As to these, the Court held that the state had the power to require evidence of the patient's wishes rather than allowing the decision solely at the behest of family members, and that the state could properly require proof of the patient's wishes by clear and convincing evidence.

Plaintiffs in the present case argue that the reasoning and holdings of the Supreme Court in *Roe* and *Casey* are broad enough to establish that there is a fundamental right on the part of a terminally ill patient to decide to end his life, and to do so with the type of assistance described in this case. Plaintiffs also interpret the *Cruzan* decision as being tantamount to a holding that a terminally ill person has a constitutional right to require the withdrawal of life-sustaining treatment. Plaintiffs argue that it follows inevitably that there is a constitutional right of physician assisted suicide under the circumstances and in the manner at issue here.

Plaintiffs' reading of these cases is too broad. The Supreme Court has been careful to explain that the abortion cases, and other related decisions on procreation and child rearing, are not intended to lead automatically to the recognition of other fundamental rights on different subjects. *See, e.g., Bowers v. Hardwick,* 478 U.S. 186, 191, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140 (1986); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 68, n. 15, 93 S.Ct. 2628, 2641 n. 15, 37 L.Ed.2d 446 (1973). With regard to *Cruzan,* as already described, the Court did not actually make the holding upon which plaintiffs seek to rely. In any event, it would appear clear that suicide has a sufficiently different legal significance from requesting withdrawal of treatment so that a fundamental right to suicide cannot be implied from *Cruzan.*

The Supreme Court has described the considerations which are appropriate before there can be a declaration that rights "not readily identifiable in the Constitution's text" are deserving of constitutional protection. *See Bowers,* 478 U.S. at 191, 106 S.Ct. at 2844. Such rights must be implicit in the concept of ordered liberty so that neither liberty nor justice would exist if they were sacrificed. The Supreme Court has also characterized such rights as those liberties that are deeply rooted in the nation's history and traditions. *Id.* at 191–92, 106 S.Ct. at 2844–45. *See also Moore v. East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1937–38, 52 L.Ed.2d 531 (1977).

The trouble is that plaintiffs make no attempt to argue that physician assisted suicide, even in the case of terminally ill patients, has any historic recognition as a legal right. The history of the treatment of suicide by the law has been dealt with in a number of recent studies. *See, e.g.,* Thomas J. Marzen et al., *Suicide: A Constitutional Right?,* 24 Duquesne L.Rev. 1, 17–100 (1986); Note, *Physician–Assisted Suicide and New York Law,* 57 Alb.L.Rev. 819, 824–32 (1994);

84

The New York State Task Force on Life and The Law, *When Death is Sought: Assisted Suicide and Euthanasia in the Medical Context,* 54–56 (1994). Justice Scalia's concurring opinion in *Cruzan,* 497 U.S. at 294–95, 110 S.Ct. at 2859–60, also contains a useful historical summary.

Suicide was a crime under English common law, even if the motive was to avoid suffering and illness. Obviously, no punishment could be inflicted upon the deceased, but sanctions were imposed by way of forfeiture of property and ignominious burial. The American colonies apparently adopted this common law rule, but it has been gradually abandoned so that no state in this country now criminalizes suicide or attempted suicide. However, as Justice Scalia states, this change in the law resulted from a desire "to spare the innocent family and not to legitimatize the act." *Cruzan,* 497 U.S. at 294, 110 S.Ct. at 2860.

As to assisting suicide, the majority of states in this country have long imposed criminal penalties on one who aids another in committing suicide. *See Cruzan,* 497 U.S. at 280, 110 S.Ct. at 2852 (majority opinion). The Model Penal Code, adopted by the American Law Institute, provides that it is a crime to assist a suicide. *Model Penal Code* § 210.5(2) and comment at 100 (American Law Institute 1980). The comment states:

Self destruction is surely not conduct to be encouraged or taken lightly. The fact that penal sanctions will prove ineffective to deter the suicide itself does not mean that the criminal law is equally powerless to influence the behavior of those who would aid or induce another to take his own life. Moreover, in principle it would seem that the interests in the sanctity of life that are represented by the criminal homicide laws are threatened by one who expresses a willingness to participate in taking the life of another, even though the act may be accomplished with the consent, or at the request of the suicide victim.

Plaintiffs are, of course, suggesting a limited form of physician assisted suicide. But plaintiffs have pointed to nothing in the historical record to indicate that even this form of assisted suicide has been given any kind of

sanction in our legal history which would help establish it as a constitutional right.

For these reasons, the court holds that the type of physician assisted suicide at issue in this case does not involve a fundamental liberty interest protected by the Due Process Clause of the Fourteenth Amendment.

## The Equal Protection Issue

■ Plaintiffs contend that even if there is no fundamental right to engage in assisting a patient's suicide under the Due Process Clause, they should prevail under the Equal Protection Clause. Their argument proceeds thus. It is established under New York law that a competent person may refuse medical treatment, even if the withdrawal of such treatment will result in death. *See, e.g., Rivers v. Katz,* 67 N.Y.2d 485, 493, 504 N.Y.S.2d 74, 78, 495 N.E.2d 337, 340 (1986); *In re Storar,* 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64 (1981); *Schloendorff v. Soc'y of N.Y. Hosp.,* 211 N.Y. 125, 129, 105 N.E. 92, 93 (1914).

Plaintiffs further argue that such refusal of treatment is essentially the same thing as committing suicide with the advice of a physician. Plaintiffs urge that for the State to sanction one course of conduct and criminalize the other involves discrimination which violates the Equal Protection Clause of the Fourteenth Amendment.

The issue is whether the distinction drawn by New York law has a reasonable and rational basis. *Dandridge v. Williams,* 397 U.S. 471, 485, 487, 90 S.Ct. 1153, 1162–63, 25 L.Ed.2d 491 (1969). To certain ways of thinking, there may appear to be little difference between refusing treatment in the case of a terminally ill person and taking a dose of medication which leads to death. But to another way of thinking there is a very great difference. In any event, it is hardly unreasonable or irrational for the State to recognize a difference between allowing nature to take its course, even in the most severe situations, and intentionally using an artificial death-producing device. The State has obvious legitimate interests in preserving life, and in protecting vulnerable persons. The State has the further right to determine how these crucial interests are to be treated when

the issue is posed as to whether a physician can assist a patient in committing suicide. Clearly in the present public debate there are sincere and conscientious advocates for and against the concept of physician assisted suicide. Under the United States Constitution and the federal system it establishes, the resolution of this issue is left to the normal democratic processes within the State.

For these reasons the court holds that plaintiffs have not shown a violation of the Equal Protection Clause of the Fourteenth Amendment.

It should be noted that one federal district court has taken a view contrary to what is expressed in this opinion as to both the due process and the equal protection issues. *Compassion in Dying v. Washington,* 850 F.Supp. 1454 (W.D.Wash.1994). That ruling is on appeal to the Ninth Circuit.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction is denied. Defendants' motion to dismiss, treated as a motion for summary judgment, is granted, and the action is dismissed.

SO ORDERED.