VACCO, ATTORNEY GENERAL OF NEW YORK,
ET AL. *v.* QUILL ET AL.

No. 95–1858.   Argued January 8, 1997—Decided June 26, 1997

794

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-
NOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. O'CONNOR, J., filed a
concurring opinion, in which GINSBURG and BREYER, JJ., joined in part,
*ante,* p. 736. STEVENS, J., *ante,* p. 738, SOUTER, J., *post,* p. 809, GINSBURG,
J., *ante,* p. 789, and BREYER, J., *ante,* p. 789, filed opinions concurring in
the judgment.

*Dennis C. Vacco,* Attorney General of New York, *pro se,* ar-
gued the cause for petitioners. With him on the briefs were
*Barbara Gott Billet,* Solicitor General, and *Daniel Smir-
lock* and *Michael S. Popkin,* Assistant Attorneys General.

*Acting Solicitor General Dellinger* argued the cause for
the United States as *amicus curiae* urging reversal. With
him on the brief were *Assistant Attorney General Hun-
ger, Deputy Solicitor General Waxman, Deputy Assistant*

*Attorney General Preston, Barbara C. Biddle,* and *Ann Hubbard.*

*Laurence H. Tribe* argued the cause for respondents. With him on the brief were *Peter J. Rubin, Kathryn L. Tucker, David J. Burman, Kari Anne Smith,* and *Carla A. Kerr.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of California et al. by *Daniel E. Lungren,* Attorney General of California, *Robert L. Mukai,* Chief Assistant Attorney General, *Alvin J. Korobkin,* Senior Assistant Attorney General, and *Thomas S. Lazar,* Deputy Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Jeff Sessions* of Alabama, *Gale A. Norton* of Colorado, *Robert A. Butterworth* of Florida, *Michael J. Bowers* of Georgia, *James E. Ryan* of Illinois, *Thomas J. Miller* of Iowa, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.,* of Maryland, *Frank J. Kelley* of Michigan, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Jeffrey R. Howard* of New Hampshire, *Drew Edmondson* of Oklahoma, *Pedro R. Pierluisi* of Puerto Rico, *Charles Molony Condon* of South Carolina, *Mark W. Barnett* of South Dakota, *Charles W. Burson* of Tennessee, *James S. Gilmore III* of Virginia, and *Christine O. Gregoire* of Washington; for Wayne County, Michigan, by *John D. O'Hair* and *Timothy A. Baughman;* for Agudath Israel of America by *David Zwiebel* and *Morton M. Avigdor;* for the American Association of Homes and Services for the Aging et al. by *Joel G. Chefitz* and *Robert K. Niewijk;* for the American Center for Law and Justice by *Jay Alan Sekulow, James M. Henderson, Sr., Walter M. Weber, Keith A. Fournier, John G. Stepanovich,* and *Thomas P. Monaghan;* for the American Geriatrics Society by *John H. Pickering* and *Joseph E. Schmitz;* for the American Hospital Association by *Michael K. Kellogg* and *Margaret J. Hardy;* for the American Medical Association et al. by *Carter G. Phillips, Mark E. Haddad, Paul E. Kalb, Katherine L. Adams, Newton N. Minow, Jack R. Bierig, Kirk B. Johnson,* and *Michael L. Ile;* for the Catholic Health Association of the United States by *James A. Serritella, James C. Geoly, Kevin R. Gustafson, Thomas C. Shields, Peter M. Leibold,* and *Charles S. Gilham;* for the Catholic Medical Association by *Joseph J. Frank, Sergio Alvarez-Mena III,* and *Peter Buscemi;* for the Christian Legal Society et al. by *Edward J. Larson, Kimberlee Wood Colby,* and *Steven T. McFarland;* for the Clarendon Foundation by *Ronald D. Maines;* for the Evangelical Lutheran Church in America by *Edward McGlynn Gaffney, Jr., Susan D. Reece Martyn, Henry J. Bourguignon,* and *Phillip H. Harris;* for the Family Research Council by *Cathleen A. Cleaver, Mark A. Rothe,* and *Edward R. Grant;* for the Institute for Public Affairs of the Union of Orthodox Jewish

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

In New York, as in most States, it is a crime to aid another to commit or attempt suicide,[1] but patients may refuse even

Congregations of America et al. by *Richard B. Stone;* for the Medical Society of New Jersey by *Paul W. Armstrong* and *R. Bruce Crelin;* for the National Association of Prolife Nurses et al. by *Jacqulyn Kay Hall;* for the National Catholic Office for Persons with Disabilities et al. by *James Bopp, Jr., Thomas J. Marzen, Daniel Avila,* and *Jane E. T. Brockmann;* for the National Hospice Organization by *E. Barrett Prettyman, Jr.;* for the National Legal Center for the Medically Dependent & Disabled, Inc., et al. by *James Bopp, Jr., Thomas J. Marzen, Daniel Avila,* and *Jane E. T. Brockmann;* for the Project on Death in America et al. by *Robert A. Burt;* for the United States Catholic Conference et al. by *Mark E. Chopko;* for Senator Orrin Hatch et al. by *Michael W. McConnell;* for Members of the New York and Washington State Legislatures by *Paul Benjamin Linton* and *Clarke D. Forsythe;* for Bioethics Professors by *George J. Annas;* for Jerome J. De Cosse et al. by *Michael P. Tierney;* for Gary Lee, M. D., et al. by *James Bopp, Jr., Bary A. Bostrom,* and *Richard E. Coleson;* and for Richard Thompson by *Mr. Thompson, pro se,* and *Richard H. Browne.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Cameron Clark, Karen E. Boxx,* and *Steven R. Shapiro;* for Americans for Death with Dignity et al. by *John R. Reese* and *Page R. Barnes;* for the American Medical Student Association et al. by *John H. Hall;* for the Coalition of Hospice Professionals by *Gerald A. Rosenberg* and *Frances Kulka Browne;* for Gay Men's Health Crisis et al. by *Andrew I. Batavia;* for the National Women's Health Network et al. by *Sylvia A. Law;* for 36 Religious Organizations, Leaders, and Scholars by *Barbara McDowell* and *Gregory A. Castanias;* for the Washington State Psychological Association et al. by *Edward C. DuMont;* for Bioethicists by *Martin R. Gold* and *Robert P. Mulvey;* for Law Professors by *Charles H. Baron, David A. Hoffman,* and *Joshua M. Davis;* for State Legislators by *Sherry F. Colb;* and for Julian M. Whitaker, M. D., by *Jonathan W. Emord.*

Briefs of *amici curiae* were filed for the American College of Legal Medicine by *Miles J. Zaremski, Bruce C. Nelson,* and *Ila S. Rothschild;* for the American Life League, Inc., by *Charles E. Rice;* for Choice in Dying, Inc., by *Henry Putzel III;* for the International Anti-Euthanasia Task Force by *Wesley J. Smith;* for Not Dead Yet et al. by *Stephen F. Gold;* for Surviving Family Members in Support of Physician-Assisted Dying by *Katrin E. Frank, Robert A. Free,* and *Kathleen Wareham;* and for

lifesaving medical treatment.[2]  The question presented by this case is whether New York's prohibition on assisting suicide therefore violates the Equal Protection Clause of the Fourteenth Amendment.   We hold that it does not.

Petitioners are various New York public officials.  Respondents Timothy E. Quill, Samuel C. Klagsbrun, and Howard A. Grossman are physicians who practice in New York. They assert that although it would be "consistent with the standards of [their] medical practice[s]" to prescribe lethal medication for "mentally competent, terminally ill patients" who are suffering great pain and desire a doctor's help in taking their own lives, they are deterred from doing so by New York's ban on assisting suicide.  App. 25–26.[3]  Respondents, and three gravely ill patients who have since died,[4] sued the State's Attorney General in the United States

Ronald Dworkin et al. by *Mr. Dworkin, pro se, Peter L. Zimroth, Philip H. Curtis, Kent A. Yalowitz, Anand Agneshwar,* and *Abe Krash.*

[1] New York Penal Law § 125.15 (McKinney 1987) ("Manslaughter in the second degree") provides: "A person is guilty of manslaughter in the second degree when . . . (3) He intentionally causes or aids another person to commit suicide.  Manslaughter in the second degree is a class C felony." Section 120.30 ("Promoting a suicide attempt") states: "A person is guilty of promoting a suicide attempt when he intentionally causes or aids another person to attempt suicide.  Promoting a suicide attempt is a class E felony."  See generally *Washington* v. *Glucksberg, ante,* at 710–719.

[2] "It is established under New York law that a competent person may refuse medical treatment, even if the withdrawal of such treatment will result in death." *Quill* v. *Koppell,* 870 F. Supp. 78, 84 (SDNY 1994); see N. Y. Pub. Health Law, §§ 2960–2979 (McKinney 1993 and Supp. 1997) ("Orders Not to Resuscitate") (regulating right of "adult with capacity" to direct issuance of orders not to resuscitate); *id.,* §§ 2980–2994 ("Health Care Agents and Proxies") (allowing appointment of agents "to make . . . health care decisions on the principal's behalf," including decisions to refuse lifesaving treatment).

[3] Declaration of Timothy E. Quill, M. D., App. 42–49; Declaration of Samuel C. Klagsbrun, M. D., *id.,* at 68–74; Declaration of Howard A. Grossman, M. D., *id.,* at 84–89; 80 F. 3d 716, 719 (CA2 1996).

[4] These three patients stated that they had no chance of recovery, faced the "prospect of progressive loss of bodily function and integrity and increasing pain and suffering," and desired medical assistance in ending

798

District Court. They urged that because New York permits a competent person to refuse life-sustaining medical treatment, and because the refusal of such treatment is "essentially the same thing" as physician-assisted suicide, New York's assisted-suicide ban violates the Equal Protection Clause. *Quill* v. *Koppell*, 870 F. Supp. 78, 84–85 (SDNY 1994).

The District Court disagreed: "[I]t is hardly unreasonable or irrational for the State to recognize a difference between allowing nature to take its course, even in the most severe situations, and intentionally using an artificial death-producing device." *Id.*, at 84. The court noted New York's "obvious legitimate interests in preserving life, and in protecting vulnerable persons," and concluded that "[u]nder the United States Constitution and the federal system it establishes, the resolution of this issue is left to the normal democratic processes within the State." *Id.*, at 84–85.

The Court of Appeals for the Second Circuit reversed. 80 F. 3d 716 (1996). The court determined that, despite the assisted-suicide ban's apparent general applicability, "New York law does not treat equally all competent persons who are in the final stages of fatal illness and wish to hasten their deaths," because "those in the final stages of terminal illness who are on life-support systems are allowed to hasten their deaths by directing the removal of such systems; but those who are similarly situated, except for the previous attachment of life-sustaining equipment, are not allowed to hasten death by self-administering prescribed drugs." *Id.*, at 727, 729. In the court's view, "[t]he ending of life by [the withdrawal of life-support systems] is *nothing more nor less than assisted suicide.*" *Id.*, at 729 (emphasis added). The Court of Appeals then examined whether this supposed unequal treatment was rationally related to any legitimate state

---

their lives. App. 25–26; Declaration of William A. Barth, *id.*, at 96–98; Declaration of George A. Kingsley, *id.*, at 99–102; Declaration of Jane Doe, *id.*, at 105–109.

interests,[5] and concluded that "to the extent that [New York's statutes] prohibit a physician from prescribing medications to be self-administered by a mentally competent, terminally-ill person in the final stages of his terminal illness, they are not rationally related to any legitimate state interest." *Id.*, at 731. We granted certiorari, 518 U. S. 1055 (1996), and now reverse.

The Equal Protection Clause commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." This provision creates no substantive rights. *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 33 (1973); *id.*, at 59 (Stewart, J., concurring). Instead, it embodies a general rule that States must treat like cases. alike but may treat unlike cases accordingly. *Plyler* v. *Doe*, 457 U. S. 202, 216 (1982) (" '[T]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same' ") (quoting *Tigner* v. *Texas*, 310 U. S. 141, 147 (1940)). If a legislative classification or distinction "neither burdens a fundamental right nor targets a' suspect class, we will uphold [it] so long as it bears a rational relation to some legitimate end." *Romer* v. *Evans*, 517 U. S. 620, 631 (1996).

New York's statutes outlawing assisting suicide affect and address matters of profound significance to all New Yorkers alike. They neither infringe fundamental rights nor involve suspect classifications. *Washington* v. *Glucksberg, ante,* at 719–728; see 80 F. 3d, at 726; *San Antonio School Dist.*, 411 U. S., at 28 ("The system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness"); *id.*, at 33–35 (courts must look to the Constitution, not the "importance" of the asserted right, when deciding whether an asserted right is "fundamental"). These laws

---

[5] The court acknowledged that because New York's assisted-suicide statutes "do not impinge on any fundamental rights [or] involve suspect classifications," they were subject only to rational-basis judicial scrutiny. 80 F. 3d, at 726–727.

are therefore entitled to a "strong presumption of validity." *Heller* v. *Doe,* 509 U. S. 312, 319 (1993).

On their faces, neither New York's ban on assisting suicide nor its statutes permitting patients to refuse medical treatment treat anyone differently from anyone else or draw any distinctions between persons. *Everyone,* regardless of physical condition, is entitled, if competent, to refuse unwanted lifesaving medical treatment; *no one* is permitted to assist a suicide. Generally speaking, laws that apply evenhandedly to all "unquestionably comply" with the Equal Protection Clause. *New York City Transit Authority* v. *Beazer,* 440 U. S. 568, 587 (1979); see *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256, 271–273 (1979) ("[M]any [laws] affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by the law").

The Court of Appeals, however, concluded that some terminally ill people—those who are on life-support systems—are treated differently from those who are not, in that the former may "hasten death" by ending treatment, but the latter may not "hasten death" through physician-assisted suicide. 80 F. 3d, at 729. This conclusion depends on the submission that ending or refusing lifesaving medical treatment "is nothing more nor less than assisted suicide." *Ibid.* Unlike the Court of Appeals, we think the distinction between assisting suicide and withdrawing life-sustaining treatment, a distinction widely recognized and endorsed in the medical profession[6] and in our legal traditions, is both important and

---

[6] The American Medical Association emphasizes the "fundamental difference between refusing life-sustaining treatment and demanding a life-ending treatment." American Medical Association, Council on Ethical and Judicial Affairs, Physician-Assisted Suicide, 10 Issues in Law & Medicine 91, 93 (1994); see also American Medical Association, Council on Ethical and Judicial Affairs, Decisions Near the End of Life, 267 JAMA 2229, 2230–2231, 2233 (1992) ("The withdrawing or withholding of life-sustaining treatment is not inherently contrary to the principles of beneficence and nonmaleficence," but assisted suicide "is contrary to the prohibition

logical; it is certainly rational. See *Feeney, supra,* at 272 ("When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern").

The distinction comports with fundamental legal principles of causation and intent. First, when a patient refuses life-sustaining medical treatment, he dies from an underlying fatal disease or pathology; but if a patient ingests lethal medication prescribed by a physician, he is killed by that medication. See, *e. g., People* v. *Kevorkian,* 447 Mich. 436, 470–472, 527 N. W. 2d 714, 728 (1994), cert. denied, 514 U. S. 1083 (1995); *Matter of Conroy,* 98 N. J. 321, 355, 486 A. 2d 1209, 1226 (1985) (when feeding tube is removed, death "result[s] . . . from [the patient's] underlying medical condition"); *In re Colyer,* 99 Wash. 2d 114, 123, 660 P. 2d 738, 743 (1983) ("[D]eath which occurs after the removal of life sustaining systems is from natural causes"); American Medical Association, Council on Ethical and Judicial Affairs, Physician-Assisted Suicide, 10 Issues in Law & Medicine 91, 93 (1994) ("When a life-sustaining treatment is declined, the patient dies primarily because of an underlying disease").

Furthermore, a physician who withdraws, or honors a patient's refusal to begin, life-sustaining medical treatment purposefully intends, or may so intend, only to respect his patient's wishes and "to cease doing useless and futile or degrading things to the patient when [the patient] no longer stands to benefit from them." Assisted Suicide in the

against using the tools of medicine to cause a patient's death"); New York State Task Force on Life and the Law, When Death is Sought: Assisted Suicide and Euthanasia in the Medical Context 108 (1994) ("[Professional organizations] consistently distinguish assisted suicide and euthanasia from the withdrawing or withholding of treatment, and from the provision of palliative treatments or other medical care that risk fatal side effects"); Brief for American Medical Association et al. as *Amici Curiae* 18–25. Of course, as respondents' lawsuit demonstrates, there are differences of opinion within the medical profession on this question. See New York Task Force, *supra,* at 104–109.

United States, Hearing before the Subcommittee on the Constitution of the House Committee on the Judiciary, 104th Cong., 2d Sess., 368 (1996) (testimony of Dr. Leon R. Kass). The same is true when a doctor provides aggressive palliative care; in some cases, painkilling drugs may hasten a patient's death, but the physician's purpose and intent is, or may be, only to ease his patient's pain. A doctor who assists a suicide, however, "must, necessarily and indubitably, intend primarily that the patient be made dead." *Id.*, at 367. Similarly, a patient who commits suicide with a doctor's aid necessarily has the specific intent to end his or her own life, while a patient who refuses or discontinues treatment might not. See, *e. g., Matter of Conroy, supra,* at 351, 486 A. 2d, at 1224 (patients who refuse life-sustaining treatment "may not harbor a specific intent to die" and may instead "fervently wish to live, but to do so free of unwanted medical technology, surgery, or drugs"); *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728, 743, n. 11, 370 N. E. 2d 417, 426, n. 11 (1977) ("[I]n refusing treatment the patient may not have the specific intent to die").

The law has long used actors' intent or purpose to distinguish between two acts that may have the same result. See, *e. g., United States* v. *Bailey,* 444 U. S. 394, 403–406 (1980) ("[T]he . . . common law of homicide often distinguishes . . . between a person who knows that another person will be killed as the result of his conduct and a person who acts with the specific purpose of taking another's life"); *Morissette* v. *United States,* 342 U. S. 246, 250 (1952) (distinctions based on intent are "universal and persistent in mature systems of law"); M. Hale, 1 Pleas of the Crown 412 (1847) ("If A. with an intent to prevent a gangrene beginning in his hand doth without any advice cut off his hand, by which he dies, he is not thereby *felo de se* for tho it was a voluntary act, yet it was not with an intent to kill himself"). Put differently, the law distinguishes actions taken "because of" a given end

from actions taken "in spite of" their unintended but foreseen consequences. *Feeney*, 442 U. S., at 279; *Compassion in Dying* v. *Washington*, 79 F. 3d 790, 858 (CA9 1996) (Kleinfeld, J., dissenting) ("When General Eisenhower ordered American soldiers onto the beaches of Normandy, he knew that he was sending many American soldiers to certain death . . . . His purpose, though, was to . . . liberate Europe from the Nazis").

Given these general principles, it is not surprising that many courts, including New York courts, have carefully distinguished refusing life-sustaining treatment from suicide. See, *e. g., Fosmire* v. *Nicoleau*, 75 N. Y. 2d 218, 227, and n. 2, 551 N. E. 2d 77, 82, and n. 2 (1990) ("[M]erely declining medical care . . . is not considered a suicidal act").[7]  In fact, the first state-court decision explicitly to authorize withdrawing lifesaving treatment noted the "real distinction between the self-infliction of deadly harm and a self-determination against artificial life support." *In re Quinlan*, 70 N. J. 10, 43, 52, and n. 9, 355 A. 2d 647, 665, 670, and n. 9, cert. denied *sub nom. Garger* v. *New Jersey*, 429 U. S. 922 (1976).  And recently, the Michigan Supreme Court also rejected the argument that the distinction "between acts that artificially sustain life and acts that artificially curtail life" is merely a "distinction without constitutional significance—a meaning-

---

[7] Thus, the Second Circuit erred in reading New York law as creating a "right to hasten death"; instead, the authorities cited by the court recognize a right to refuse treatment, and nowhere equate the exercise of this right with suicide. *Schloendorff* v. *Society of New York Hospital*, 211 N. Y. 125, 129–130, 105 N. E. 92, 93 (1914), which contains Justice Cardozo's famous statement that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body," was simply an informed-consent case.  See also *Rivers* v. *Katz*, 67 N. Y. 2d 485, 495, 495 N. E. 2d 337, 343 (1986) (right to refuse antipsychotic medication is not absolute, and may be limited when "the patient presents a danger to himself"); *Matter of Storar*, 52 N. Y. 2d 363, 377, n. 6, 420 N. E. 2d 64, 71, n. 6, cert. denied, 454 U. S. 858 (1981).

less exercise in semantic gymnastics," insisting that "the *Cruzan* majority disagreed and so do we." *Kevorkian,* 447 Mich., at 471, 527 N. W. 2d, at 728.[8]

Similarly, the overwhelming majority of state legislatures have drawn a clear line between assisting suicide and with-

_____

[8] Many courts have recognized this distinction. See, *e. g., Kevorkian* v. *Thompson,* 947 F. Supp. 1152, 1178, and nn. 20–21 (ED Mich. 1997); *In re Fiori,* 543 Pa. 592, 602, 673 A. 2d 905, 910 (1996); *Singletary* v. *Costello,* 665 So. 2d 1099, 1106 (Fla. App. 1996); *Laurie* v. *Senecal,* 666 A. 2d 806, 808–809 (R. I. 1995); *State ex rel. Schuetzle* v. *Vogel,* 537 N. W. 2d 358, 360 (N. D. 1995); *Thor* v. *Superior Court,* 5 Cal. 4th 725, 741–742, 855 P. 2d 375, 385–386 (1993); *DeGrella* v. *Elston,* 858 S. W. 2d 698, 707 (Ky. 1993); *People* v. *Adams,* 216 Cal. App. 3d 1431, 1440, 265 Cal. Rptr. 568, 573–574 (1990); *Guardianship of Jane Doe,* 411 Mass. 512, 522–523, 583 N. E. 2d 1263, 1270, cert. denied *sub nom. Doe* v. *Gross,* 503 U. S. 950 (1992); *In re L. W.,* 167 Wis. 2d 53, 83, 482 N. W. 2d 60, 71 (1992); *In re Rosebush,* 195 Mich. App. 675, 681, n. 2, 491 N. W. 2d 633, 636, n. 2 (1992); *Donaldson* v. *Van de Kamp,* 2 Cal. App. 4th 1614, 1619–1625, 4 Cal. Rptr. 2d 59, 61–64 (1992); *In re Lawrance,* 579 N. E. 2d 32, 40, n. 4 (Ind. 1991); *McKay* v. *Bergstedt,* 106 Nev. 808, 822–823, 801 P. 2d 617, 626–627 (1990); *In re Browning,* 568 So. 2d 4, 14 (Fla. 1990); *McConnell* v. *Beverly Enterprises-Connecticut, Inc.,* 209 Conn. 692, 710, 553 A. 2d 596, 605 (1989); *State* v. *McAfee,* 259 Ga. 579, 581, 385 S. E. 2d 651, 652 (1989); *In re Grant,* 109 Wash. 2d 545, 563, 747 P. 2d 445, 454–455 (1987); *In re Gardner,* 534 A. 2d 947, 955–956 (Me. 1987); *Matter of Farrell,* 108 N. J. 335, 349–350, 529 A. 2d 404, 411 (1987); *Rasmussen* v. *Fleming,* 154 Ariz. 207, 218, 741 P. 2d 674, 685 (1987); *Bouvia* v. *Superior Court,* 179 Cal. App. 3d 1127, 1144–1145, 225 Cal. Rptr. 297, 306 (1986); *Von Holden* v. *Chapman,* 87 App. Div. 2d 66, 70, 450 N. Y. S. 2d 623, 627 (1982); *Bartling* v. *Superior Court,* 163 Cal. App. 3d 186, 196–197, 209 Cal. Rptr. 220, 225–226 (1984); *Foody* v. *Manchester Memorial Hospital,* 40 Conn. Supp. 127, 137, 482 A. 2d 713, 720 (1984); *In re P. V. W.,* 424 So. 2d 1015, 1022 (La. 1982); *Leach* v. *Akron General Medical Center,* 68 Ohio Misc. 1, 10, 426 N. E. 2d 809, 815 (Ohio Comm. Pleas 1980); *In re Severns,* 425 A. 2d 156, 161 (Del. Ch. 1980); *Satz* v. *Perlmutter,* 362 So. 2d 160, 162–163 (Fla. App. 1978); *Application of the President and Directors of Georgetown College,* 331 F. 2d 1000, 1009 (CADC), cert. denied, 377 U. S. 978 (1964); *Brophy* v. *New England Sinai Hospital,* 398 Mass. 417, 439, 497 N. E. 2d 626, 638 (1986). The British House of Lords has also recognized the distinction. *Airedale N. H. S. Trust* v. *Bland,* 2 W. L. R. 316, 368 (1993).

drawing or permitting the refusal of unwanted lifesaving medical treatment by prohibiting the former and permitting the latter. *Glucksberg, ante,* at 710–711, 716–719. And "nearly all states expressly disapprove of suicide and assisted suicide either in statutes dealing with durable powers of attorney in health-care situations, or in 'living will' statutes." *Kevorkian, supra,* at 478–479, and nn. 53–54, 527 N. W. 2d, at 731–732, and nn. 53–54.[9] Thus, even as the

---

[9] See Ala. Code §22–8A–10 (1990); Alaska Stat. Ann. §§18.12.080(a), (f) (1996); Ariz. Rev. Stat. Ann. §36–3210 (Supp. 1996); Ark. Code Ann. §§20–13–905(a), (f), 20–17–210(a), (g) (1991 and Supp. 1995); Cal. Health & Safety Code Ann. §§7191.5(a), (g) (West Supp. 1997); Cal. Prob. Code Ann. §4723 (West Supp. 1997); Colo. Rev. Stat. §§15–14–504(4), 15–18–112(1), 15–18.5–101(3), 15–18.6–108 (1987 and Supp. 1996); Conn. Gen. Stat. §19a–575 (Supp. 1996); Del. Code Ann., Tit. 16, §2512 (Supp. 1996); D. C. Code Ann. §§6–2430, 21–2212 (1995 and Supp. 1996); Fla. Stat. §§765.309(1), (2) (Supp. 1997); Ga. Code Ann. §§31–32–11(b), 31–36–2(b) (1996); Haw. Rev. Stat. §327D–13 (1996); Idaho Code §39–152 (Supp. 1996); Ill. Comp. Stat., ch. 755, §§35/9(f), 40/5, 40/50, 45/2–1 (1992); Ind. Code §§16–36–1–13, 16–36–4–19, 30–5–5–17 (1994 and Supp. 1996); Iowa Code §§144A.11.1–144A.11.6, 144B.12.2 (1989 and Supp. 1997); Kan. Stat. Ann. §65–28,109 (1985); Ky. Rev. Stat. Ann. §311.638 (Baldwin Supp. 1992); La. Rev. Stat. Ann. §§40:1299.58.10(A), (B) (West 1992); Me. Rev. Stat. Ann., Tit. 18–A, §§5–813(b), (c) (Supp. 1996); Md. Health Code Ann. §5–611(c) (1994); Mass. Gen. Laws 201D, §12 (Supp. 1997); Mich. Comp. Laws Ann. §700.496(20) (West 1995); Minn. Stat. §§145B.14, 145C.14 (Supp. 1997); Miss. Code Ann. §§41–41–117(2), 41–41–119(1) (Supp. 1992); Mo. Rev. Stat. §§459.015.3, 459.055(5) (1992); Mont. Code Ann. §§50–9–205(1), (7), 50–10–104(1), (6) (1995); Neb. Rev. Stat. §§20–412(1), (7), 30–3401(3) (1995); Nev. Rev. Stat. §449.670(2) (1996); N. H. Rev. Stat. Ann. §§137–H:10, 137–H:13, 137–J:1 (1996); N. J. Stat. Ann. §§26:2H–54(d), (e), 26:2H–77 (West 1996); N. M. Stat. Ann. §§24–7A–13(B)(1), (C) (Supp. 1995); N. Y. Pub. Health Law §2989(3) (McKinney 1993); N. C. Gen. Stat. §§90–320(b), 90–321(f) (1993); N. D. Cent. Code §§23–06.4–01, 23–06.5–01 (1991); Ohio Rev. Code Ann. §§2133.12(A), (D) (Supp. 1996); Okla. Stat., Tit. 63, §§3101.2(C), 3101.12(A), (G) (1997); 20 Pa. Cons. Stat. §5402(b) (Supp. 1996); R. I. Gen. Laws §§23–4.10–9(a), (f), 23–4.11–10(a), (f) (1996); S. C. Code Ann. §§44–77–130, 44–78–50(A), (C), 62–5–504(O) (Supp. 1996); S. D. Codified Laws §§34–12D–14, 34–12D–20 (1994); Tenn. Code Ann. §§32–11–110(a), 39–13–216 (Supp. 1996); Tex.

States move to protect and promote patients' dignity at the end of life, they remain opposed to physician-assisted suicide.

New York is a case in point. The State enacted its current assisted-suicide statutes in 1965.[10] Since then, New York has acted several times to protect patients' common-law right to refuse treatment. Act of Aug. 7, 1987, ch. 818, § 1, 1987 N. Y. Laws 3140 ("Do Not Resuscitate Orders") (codified as amended at N. Y. Pub. Health Law §§ 2960–2979 (McKinney 1993 and Supp. 1997)); Act of July 22, 1990, ch. 752, § 2, 1990 N. Y. Laws 3547 ("Health Care Agents and Proxies") (codified as amended at N. Y. Pub. Health Law §§ 2980–2994 (McKinney 1993 and Supp. 1997)). In so doing, however, the State has neither endorsed a general right to "hasten death" nor approved physician-assisted suicide. Quite the opposite: The State has reaffirmed the line between "killing" and "letting die." See N. Y. Pub. Health Law § 2989(3) (McKinney 1993) ("This article is not intended to permit or promote suicide, assisted suicide, or euthanasia"); New York State Task Force on Life and the Law, Life-Sustaining Treatment: Making Decisions and Appointing a Health Care Agent 36–42 (July 1987); Do Not Resuscitate Orders: The Proposed Legislation and Report of the New York State Task Force on Life and the Law 15 (Apr. 1986). More recently, the New York State Task Force on Life and

---

Health & Safety Code Ann. §§ 672.017, 672.020, 672.021 (1992); Utah Code Ann. §§ 75-2-1116, 75-2-1118 (1993); Vt. Stat. Ann., Tit. 18, § 5260 (1987); Va. Code Ann. § 54.1-2990 (1994); V. I. Code Ann., Tit. 19, §§ 198(a), (g) (1995); Wash. Rev. Code §§ 70.122.070(1), 70.122.100 (Supp. 1997); W. Va. Code §§ 16-30-10, 16-30A-16(a), 16-30B-2(b), 16-30B-13, 16-30C-14 (1995); Wis. Stat. §§ 154.11(1), (6), 154.25(7), 155.70(7) (Supp. 1996); Wyo. Stat. §§ 3-5-211, 35-22-109, 35-22-208 (1994 and Supp. 1996). See also 42 U. S. C. §§ 14402(b)(1), (2), (4) (1994 ed., Supp. III) ("Assisted Suicide Funding Restriction Act of 1997").

[10] It has always been a crime, either by statute or under the common law, to assist a suicide in New York. See Marzen, O'Dowd, Crone, & Balch, Suicide: A Constitutional Right?, 24 Duquesne L. Rev. 1, 205–210 (1985) (App.).

the Law studied assisted suicide and euthanasia and, in 1994, unanimously recommended against legalization. When Death is Sought: Assisted Suicide and Euthanasia in the Medical Context vii (1994). In the Task Force's view, "allowing decisions to forgo life-sustaining treatment and allowing assisted suicide or euthanasia have radically different consequences and meanings for public policy." *Id.*, at 146.

This Court has also recognized, at least implicitly, the distinction between letting a patient die and making that patient die. In *Cruzan* v. *Director, Mo. Dept. of Health*, 497 U. S. 261, 278 (1990), we concluded that "[t]he principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions," and we assumed the existence of such a right for purposes of that case, *id.*, at 279. But our assumption of a right to refuse treatment was grounded not, as the Court of Appeals supposed, on the proposition that patients have a general and abstract "right to hasten death," 80 F. 3d, at 727–728, but on well-established, traditional rights to bodily integrity and freedom from unwanted touching, *Cruzan*, 497 U. S., at 278–279; *id.*, at 287–288 (O'CONNOR, J., concurring). In fact, we observed that "the majority of States in this country have laws imposing criminal penalties on one who assists another to commit suicide." *Id.*, at 280. *Cruzan* therefore provides no support for the notion that refusing life-sustaining medical treatment is "nothing more nor less than suicide."

For all these reasons, we disagree with respondents' claim that the distinction between refusing lifesaving medical treatment and assisted suicide is "arbitrary" and "irrational." Brief for Respondents 44.[11] Granted, in some cases,

---

[11] Respondents also argue that the State irrationally distinguishes between physician-assisted suicide and "terminal sedation," a process respondents characterize as "induc[ing] barbiturate coma and then starv[ing] the person to death." Brief for Respondents 48–50; see 80 F. 3d,

the line between the two may not be clear, but certainty is not required, even were it possible.[12] Logic and contemporary practice support New York's judgment that the two acts are different, and New York may therefore, consistent with the Constitution, treat them differently. By permitting everyone to refuse unwanted medical treatment while prohibiting anyone from assisting a suicide, New York law follows a longstanding and rational distinction.

New York's reasons for recognizing and acting on this distinction—including prohibiting intentional killing and preserving life; preventing suicide; maintaining physicians' role as their patients' healers; protecting vulnerable people from

---

at 729. Petitioners insist, however, that "'[a]lthough proponents of physician-assisted suicide and euthanasia contend that terminal sedation is covert physician-assisted suicide or euthanasia, the concept of sedating pharmacotherapy is based on informed consent and the principle of double effect.'" Reply Brief for Petitioners 12 (quoting P. Rousseau, Terminal Sedation in the Care of Dying Patients, 156 Archives Internal Med. 1785, 1785–1786 (1996)). Just as a State may prohibit assisting suicide while permitting patients to refuse unwanted lifesaving treatment, it may permit palliative care related to that refusal, which may have the foreseen but unintended "double effect" of hastening the patient's death. See New York Task Force, When Death is Sought, *supra* n. 6, at 163 ("It is widely recognized that the provision of pain medication is ethically and professionally acceptable even when the treatment may hasten the patient's death, if the medication is intended to alleviate pain and severe discomfort, not to cause death").

[12] We do not insist, as JUSTICE STEVENS suggests, *ante*, at 750 (opinion concurring in judgments), that "in all cases there will in fact be a significant difference between the intent of the physicians, the patients, or the families [in withdrawal-of-treatment and physician-assisted-suicide cases]." See *supra*, at 801–802 ("[A] physician who withdraws, or honors a patient's refusal to begin, life-sustaining medical treatment purposefully intends, *or may so intend*, only to respect his patient's wishes . . . . The same is true when a doctor provides aggressive palliative care; . . . the physician's purpose and intent is, *or may be*, only to ease his patient's pain" (emphasis added)). In the absence of omniscience, however, the State is entitled to act on the reasonableness of the distinction.

indifference, prejudice, and psychological and financial pressure to end their lives; and avoiding a possible slide towards euthanasia—are discussed in greater detail in our opinion in *Glucksberg, ante.* These valid and important public interests easily satisfy the constitutional requirement that a legislative classification bear a rational relation to some legitimate end.[13]

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

[For concurring opinion of JUSTICE O'CONNOR, see *ante,* p. 736; for opinions concurring in the judgments of JUSTICE STEVENS, see *ante,* p. 738, JUSTICE GINSBURG, see *ante,* p. 789, and JUSTICE BREYER, see *ante,* p. 789.]

JUSTICE SOUTER, concurring in the judgment.

Even though I do not conclude that assisted suicide is a fundamental right entitled to recognition at this time, I accord the claims raised by the patients and physicians in this case and *Washington* v. *Glucksberg* a high degree of importance, requiring a commensurate justification. See *Washington* v. *Glucksberg, ante,* at 782 (SOUTER, J., concurring in judgment). The reasons that lead me to conclude in *Glucksberg* that the prohibition on assisted suicide is not arbitrary under the due process standard also support the distinction between assistance to suicide, which is banned, and

---

[13] JUSTICE STEVENS observes that our holding today "does not foreclose the possibility that some applications of the New York statute may impose an intolerable intrusion on the patient's freedom." *Ante,* at 751–752 (opinion concurring in judgments). This is true, but, as we observe in *Glucksberg, ante,* at 735, n. 24, a particular plaintiff hoping to show that New York's assisted-suicide ban was unconstitutional in his particular case would need to present different and considerably stronger arguments than those advanced by respondents here.

practices such as termination of artificial life support and death-hastening pain medication, which are permitted. I accordingly concur in the judgment of the Court.